# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

MID CONTINENT NAIL CORPORATION,

            **Plaintiff,**

            **v.**

UNITED STATES,

            **Defendant,**

            **and**

DUBAI WIRE FZE, *et al.*,

            **Defendant-Intervenors.**

</td><td>

Consol. Court No. 12-00133

Before: Hon. Gregory W. Carman, Judge

</td></tr>
</table>

## ORDER

Upon consideration of Plaintiff Mid Continent Nail Corporation's ("Mid Continent") Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby:

**ORDERED**, that Mid Continent's Motion is **GRANTED**; and it is further

**ORDERED**, that the Department of Commerce's determinations (1) that Precision Fasteners LLC ("Precision"), was not affiliated with Millennium Steel & Wire LLC ("Millennium") and (2) to use the financial statement of Abu Dhabi National Company for Building Materials ("BILDCO") as the source of respondents' constructed value profit are not supported by substantial evidence, and otherwise not in accordance with law; and it is further

**ORDERED**, that this action be remanded to the Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED.**

_____
Judge Gregory W. Carman

Dated: _____
          New York, New York

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

MID CONTINENT NAIL CORPORATION,

          Plaintiff,

          v.

UNITED STATES,

          Defendant,

          and

DUBAI WIRE FZE, *et al.*,

          Defendant-Intervenors.

Consol. Court No. 12-00133

Before: Hon. Gregory W. Carman, Judge

## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.2, Plaintiff Mid Continent Nail Corporation ("Mid Continent") hereby moves for judgment on the agency record with regard to portions of the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of certain steel nails from the United Arab Emirates.

The administrative determination under challenge is the final determination of Commerce in *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't Commerce Mar. 23, 2012) (final determination of sales at less than fair value), as amended by *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 27,421 (Dep't Commerce May 10, 2012) (amended final determination of sales at less than fair value and antidumping duty order), and the accompanying Issues and Decision Memorandum.

Mid Continent respectfully moves, for the reasons explained in the accompanying memorandum of points and authorities, that this Court find that the following Commerce findings, conclusions, and/or determinations are unreasonable, not supported by substantial evidence, and/or otherwise not in accordance with law:

- Commerce's determination that one of the respondents in this investigation, Precision Fasteners LLC ("Precision"), was not affiliated with another UAE company, Millennium Steel & Wire LLC ("Millennium"), by virtue of Millennium's control over Precision and/or the parties' close supplier relationship; and

- Commerce's choice of Abu Dhabi National Company for Building Materials ("BILDCO") – which almost exclusively buys and sells goods, and does not manufacture anything made from steel – as the source of respondents' constructed value ("CV") profit.

Mid Continent further moves that the Court remand these determinations to Commerce for disposition consistent with the Court's final opinion. A proposed Order is attached.

Respectfully submitted,

Adam H. Gordon
Robert E. DeFrancesco, III
Laura El-Sabaawi

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

Counsel for Plaintiff Mid Continent Nail
Corporation

October 16, 2012

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**MID CONTINENT NAIL CORPORATION,**

          **Plaintiff,**

          **v.**

**UNITED STATES,**

          **Defendant,**

          **and**

**DUBAI WIRE FZE,** *et al.,*

          **Defendant-Intervenors.**

Consol. Court No. 12-00133

Before: Hon. Gregory W. Carman, Judge

**NON-CONFIDENTIAL VERSION**

Business Proprietary Information has been removed from the Table of Contents and pages 2, 5-9, 14-33, and 39.

---

## MEMORANDUM IN SUPPORT OF MID CONTINENT NAIL CORPORATION'S RULE 56.2 MOTION

Adam H. Gordon
Robert E. DeFrancesco, III
Laura El-Sabaawi

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC  20006
(202) 719-7000

October 16, 2012

13510260.1

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   RULE 56.2 STATEMENT ......................................................................................1

    A.    Administrative Decision Sought to Be Reviewed .................................1

    B.    Statement of Issues Presented and Summary of Argument ....................2

III.  STANDARD OF REVIEW ......................................................................................3

IV.   STATEMENT OF FACTS .......................................................................................4

    A.    The Substantial Evidence of Precision's and Millennium's Affiliation .................5

        1.    Background on the Relationship Between Precision and Millennium ........5

        2.    Precision and Millennium's Symbiotic Operations During the Period of Investigation ...................................................................6

        3.    Precision and Millennium's Supply Relationship During the Period of Investigation ...................................................................8

    B.    Commerce's Selection of Financial Statements to Calculate Constructed Value Profit ...................................................................9

V.    ARGUMENT ......................................................................................................12

    A.    Commerce's Determination that Precision and Millennium Are Not Affiliated Is Not Supported by Substantial Evidence and Is Otherwise Not in Accordance with Law ...................................................................12

        1.    Millennium Is in a Position to Exercise Restraint or Control over Precision 12

            a.    Precision Operates [                              ], Evidencing Millennium's Ability to Exert Control over Precision and the Parties' Affiliation .....................................................14

            b.    Precision and Millennium [                              ], Further Supporting a Determination of Affiliation .....................................................18

            c.    Precision and Millennium Held Themselves Out to the Public as a Single, Affiliated Entity.............................................19

        2.    Precision and Millennium Are Affiliated by a Close Supplier Relationship 22

            a.    Overwhelming Record Evidence Indicates that Millennium and Precision Have a Close Supplier Relationship .............................23

            b.    Commerce's Finding that Precision and Millennium Do Not Have a Close Supplier Relationship Is Unsupported by Substantial Evidence and Not in Accordance with Law .................................26

            c.    Commerce Erred in Focusing Its Analysis on Whether Precision and Millennium Will Continue to Be Affiliated After the Period of Investigation ...................................................................31

28328.6

Table of Contents
(continued)

Page

B.   Commerce's Selection of BILDCO's Financial Statements to Calculate
Constructed Value Profit Is Not Supported by Substantial Evidence and
Otherwise Not in Accordance with Law ................................................................33

1.   Commerce's Use of BILDCO's Financial Statement as the Sole Source of
Constructed Value Profit Was Unreasonable and Not Supported by
Substantial Evidence on the Record .........................................................34

2.   Commerce Failed to Address Several of Mid Continent's Arguments with
Regard to the Selection of a Constructed Value Profit Source, Rendering
the Decision Not in Accordance with Law................................................38

VI.   CONCLUSION .................................................................................................................39

28328.6

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*British Steel PLC v. United States,*
  127 F.3d 1471 (Fed. Cir. 1997) ......................................................................29

*Chia Far Indus. Factory Co. v. United States,*
  28 CIT 1337, 343 F. Supp. 2d 1344 (2004).....................................................23

*Ferro Union, Inc. v. United States,*
  23 CIT 178, 44 F. Supp. 2d 1310 (1999).........................................................13

*Firth Rixson Special Steels Ltd. v. United States,*
  27 CIT 873 (2003) ...........................................................................................12

*Geum Poong Corp. v. United States,*
  26 CIT 322, 193 F. Supp. 2d 1363 (2002).......................................................33

*Hontex Enterprises, Inc. v. United States,*
  27 CIT 272, 248 F. Supp. 2d 1323 (2003)...................................................17, 33

*Hontex Enters. Inc. v. United States,*
  28 CIT 1000, 342 F. Supp. 2d 1225 (2004)...................................................18, 23

*Huaiyin Foreign Trade Corp. v. United States,*
  322 F. 3d 1369 (Fed. Cir. 2003) .........................................................................3

*Mitsubishi Heavy Indus. Ltd. v. United States,*
  23 CIT 326, 54 F. Supp. 2d 1183 (1999).......................................................23, 31

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.,*
  463 U.S. 29 (1983)............................................................................................3, 38

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ..........................................................................3

*Ta Chen Stainless Steel Pipe Co., Ltd. v. United States,*
  31 CIT 794 (2007) ...........................................................................................13

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
  298 F.3d 1330 (Fed. Cir. 2002) ..........................................................................3

*Tianjin Magnesium Int'l Co., Ltd. v. United States,*
  34 CIT __, 722 F. Supp. 2d 1322 (2010).........................................................38

iii

*Tr. in Bankr. of N. Am. Rubber Thread Co. v. United States,*
31 CIT 2040, 533 F. Supp. 2d 1290 (2007) ..........................................................29

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................3

19 U.S.C. § 1677(33) ........................................................................................12

19 U.S.C. § 1677(33)(G) ...................................................................................12

19 U.S.C. §1677b(a)(1)(B) .................................................................................9

19 U.S.C. §1677b(a)(4) ......................................................................................9

19 U.S.C. § 1677b(f)(3) .....................................................................................14

19 U.S.C. § 1677e .............................................................................................14

**REGULATIONS**

19 C.F.R. § 351.102(b) ......................................................................................13

19 C.F.R. § 351.102(b)(3) ...........................................................................*passim*

19 C.F.R. § 351.204(b) ......................................................................................32

19 C.F.R. § 351.401(f)(1) ..................................................................................13

**ADMINISTRATIVE MATERIALS**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May
19, 1997) ..........................................................................................................13

*Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't
Commerce Apr. 16, 2004) ................................................................................35

*Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 44,961 (Dep't
Commerce Aug. 1, 2008) ...................................................................................4

*Certain Steel Nails from the United Arab Emirates*, 73 Fed. Reg. 33,985 (Dep't
Commerce June 16, 2008) ..................................................................................4

*Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't
Commerce Mar. 23, 2012) ..................................................................................1

*Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 27,421 (Dep't
Commerce May 10, 2012) ...........................................................................*passim*

*Electrolytic Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Dep't Commerce
  Aug. 14, 2008) ...................................................................................................................37

*Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318
  (Dep't Commerce Oct. 18, 2011) ...................................................................................29, 30

*Solid Fertilizer Grade Ammonium Nitrate From the Russian Federation*, 65 Fed. Reg.
  1,139 (Dep't Commerce Jan. 7, 2000)..................................................................................23

*Stainless Steel Wire Rod from the Republic of Korea*, 71 Fed. Reg. 59,739 (Dep't
  Commerce Oct. 11, 2006)...........................................................................................27, 28, 29

*Stainless Steel Wire Rod from the Republic of Korea*, 72 Fed. Reg. 6,528 (Dep't
  Commerce Feb. 12, 2007) ....................................................................................................28

28328.6

## I.   INTRODUCTION

On behalf of Plaintiff Mid Continent Nail Corporation ("Mid Continent"), we respectfully submit the following Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record.

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Sought to Be Reviewed

The administrative determination challenged herein is the final determination in the antidumping duty investigation of certain steel nails from the United Arab Emirates ("UAE"), issued by the United States Department of Commerce ("Commerce") on March 23, 2012, and published as *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't Commerce Mar. 23, 2012) (final determination of sales at less than fair value), as amended by *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 27,421 (Dep't Commerce May 10, 2012) (amended final determination of sales at less than fair value and antidumping duty order) ("*Final Determination*").   *See* IAA P.R. 201 (Pl. App. 1); accompanying Issues & Decision Memorandum, IAA P.R. 193 (Pl. App. 2); and amended final determination, IAA P.R. 220 (Pl. App. 3).[1]

---

[1]    Documents on the public administrative record in this proceeding are referred to in this brief by either "P.R." or "IAA P.R.," followed by the document number assigned to them in the administrative record filed with the Court on July 11, 2012.  Documents on the confidential record are referred to by "C.R." or "IAA C.R.," followed by the document number.  The document's location in Plaintiff's Appendix of materials accompanying this Brief is also identified (*i.e.*, "Pl. App. ___").

Case 1:12-cv-00133-GWC    Document 35    Filed 10/16/12    Page 12 of 51

CIT Consol. Ct. No. 12-00133                          NON-CONFIDENTIAL VERSION

### B.    Statement of Issues Presented and Summary of Argument

**Affiliation:** **Whether Commerce's determination that one of the respondents in this investigation, Precision Fasteners LLC ("Precision"), was not affiliated with another UAE company, Millennium Steel & Wire LLC ("Millennium"), by virtue of Millennium's control over Precision and/or the parties' close supplier relationship, is supported by substantial evidence and otherwise in accordance with law?**

No.   During the period of investigation ("POI"), Precision and Millennium [

], and they held themselves out to the public as a single entity, using the

same telephone and fax numbers.  Precision was [

] – the [                                            ] production of subject merchandise – during [

] , and for [                                    ] galvanized nails for all of the POI.  Given

the substantial record evidence of Precision and Millennium's affiliation during the POI, by way

of Millennium's control over Precision and the close supplier relationship between Precision and

Millennium, both of which gave Millennium the ability to impact decisions concerning

Precision's production, pricing and cost of subject merchandise (indeed, to [

]), Commerce's determination that the two companies were

not affiliated is unsupported by substantial evidence and is unreasonable.

**Constructed Value Profit:** **Whether, in an investigation involving the production of steel nails, Commerce's choice of Abu Dhabi National Company for Building Materials ("BILDCO") – which almost exclusively buys and sells goods, and does not manufacture anything made from steel – as the source of respondents' constructed value ("CV") profit is supported by substantial evidence and otherwise in accordance with law, when the record contained data from another UAE company, whose operations include steel fabrication and whose data Commerce had used earlier in this very case?**

No.   Given the stark differences in operations and production experience between the

respondents and BILDCO, together with the fact that much more appropriate financial

statements were on the record, including a financial statement from a manufacturer of steel

2

products that Commerce had already determined produces products in the same general category as subject merchandise, Commerce's decision to rely on the financial experience of BILDCO, an entirely dissimilar UAE company, is unreasonable. Moreover, Commerce's failure to address arguments and analysis presented in Mid Continent's briefs was not in accordance with law.

## III.   <u>STANDARD OF REVIEW</u>

The Court reviews Commerce decisions in antidumping duty investigations to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's determinations are not supported by substantial evidence where it fails to provide "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of the record. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (internal citations omitted). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F. 3d 1369, 1374 (Fed. Cir. 2003) (quoting *Alt. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). Indeed, this standard essentially requires that the Court ask whether the agency's determinations are reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Where the agency's conclusions are not reasonable in light of the record evidence, they cannot stand.

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

## IV.    STATEMENT OF FACTS

This appeal arises from an antidumping duty investigation of imports of certain steel nails

from the UAE.  On March 31, 2011, Mid Continent filed a petition with Commerce and the

International Trade Commission, seeking relief from unfairly traded imports of certain steel nail

imports from the UAE, C.R. 1/P.R. 3 (Pl. App. 4), and Commerce initiated its antidumping duty

investigation on April 27, 2011.  P.R. 22 (Pl. App. 5).

The underlying investigation came three years after antidumping duty investigations of

the same merchandise from China and the UAE.  In those cases, Commerce imposed significant

duties on Chinese imports, but denied relief as to UAE imports.  *See Certain Steel Nails from the*

*People's Republic of China*, 73 Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008) (notice of

antidumping duty order); *Certain Steel Nails from the United Arab Emirates*, 73 Fed. Reg.

33,985 (Dep't Commerce June 16, 2008) (notice of final determination of sales at not less than

fair value).

Following the 2007-2008 investigations, the UAE industry more than doubled in size and

rushed back into the U.S. market, dropping prices and increasing volumes to take the market

share previously held by dumped Chinese imports.  The UAE producer investigated in the 2007-

2008 proceeding (Dubai Wire FZE ("Dubai Wire")) was joined by a new, equally large UAE

producer (Precision), effectively doubling the country's capacity, virtually all of which was

dedicated to the U.S. market.  In the 2011-2012 investigation, Commerce determined that nails

from the UAE were being dumped, and the U.S. International Trade Commission unanimously

found these imports to be a cause of material injury to the U.S. industry.  *See* IAA P.R. 201 (Pl.

App. 1).  Commerce's calculation of the final margins of dumping for those two UAE steel nail

producers – Precision and Dubai Wire – gave rise to the instant appeal.

4

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 15 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

### A.     The Substantial Evidence of Precision's and Millennium's Affiliation

Throughout the Commerce investigation, Mid Continent presented significant evidence, much of which was confirmed by Commerce at verification, of the affiliation of Precision and Millennium – a former steel nail producer in the UAE and Precision's [

]. *See, e.g.*, C.R. 17/P.R. 56 (Pl. App. 6).   Through evidence obtained by Mid Continent, Precision's responses to Commerce's questionnaires, and findings made by Commerce during its on-site verification of Precision, the record contains the following facts regarding the relationship between Precision and Millennium.

### 1.     Background on the Relationship Between Precision and Millennium

- Millennium was founded in 2005 and began producing steel wire and steel nails in 2007. IAA C.R. 39/P.R. 28 at 5 (Pl. App. 7).  Precision was incorporated and began producing nails in 2008.  *Id.* at 6.

- In [      ] 2008, the year Precision began producing nails, Precision and Millennium [
].[2]  IAA C.R. 95/P.R. 94 at 2 (Pl. App. 8); IAA C.R. 39/P.R. 28 at Exhibit SA-4 (Pl. App. 7).  The [
].   IAA  C.R.  39/P.R.  28  at Exhibit SA-4 (Pl. App. 7).

- Precision also [

].  *Id.* at Exhibit SA-9.

- On [            ], Precision and [

]."  IAA C.R. 95/P.R. 94 at 1 (Pl. App. 8).  Millennium [

---

[2]      In its case brief to the agency, based on documents submitted by Precision showing that [                                            ], Mid Continent argued that Precision and Millennium [                                    ]; rather, Precision [
], and then [                                    ].  Thus, the
[                          ] Precision's production process is not [
].  *See* IAA C.R. 195/P.R. 165 at 11 (Pl. App. 9).  As it did with other issues, Commerce ignored this issue in its *Final Determination*.

]." *Id.* at Exhibit S4-1.

- Through the [      ], the parties also [

]." IAA C.R. 39/P.R. 28 at 7 (Pl. App. 7); IAA C.R. 95/P.R. 94 at Exhibit S4-1 (Pl. App. 8).  The [                                      ].  IAA C.R. 95/P.R. 94 at Exhibit S4-1 (Pl. App. 8).

- The [                                                                    ]. *See* IAA C.R. 95/P.R. 94 at 2 and Exhibit S4-1 (Pl. App. 8).  With regard to Precision's [                ], the [      ] states that "[

]." *Id.* at Exhibit S4-1 (emphasis added).  In [                ], Precision and [                                      ]," which [                                      ].  [

].  IAA C.R. 39/P.R. 28 at Exhibit SA-9 (Pl. App. 7).  Wire-drawing machines and nail-making machines (as well as office equipment, obviously) are [                        ].

- The [      ] further provided that [

], and that Precision and Millennium would [                                      ] for [                        ].  IAA C.R. 95/ P.R. 94 at Exhibit S4-1.

## 2.    Precision and Millennium's Symbiotic Operations During the Period of Investigation

- Precision and Millennium are physically connected to one another in the same investment park in Dubai.  *See* IAA C.R. 39/P.R. 28 at 6 (Pl. App. 7).  Precision [

].  *Id.*

- For the substantial majority of the POI, Millennium [

].  It was only in September 2010 that Precision finally bought some of its own wire-drawing equipment.  *See id.* at 8-9.  Significantly, however, Precision's [      ] wire-drawing machines are [

].  IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).

- Precision [

6

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 17 of 51

CIT Consol. Ct. No. 12-00133                              NON-CONFIDENTIAL VERSION

]. *Id.* at 4-5.  According to Precision, [

].*" Id.* at 5 (Pl. App. 11).

- Millennium's facility, which [
  ] Precision's.  IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).  A gate allows [                    ] to pass between [                              ] of the building.  IAA C.R. 178/P.R. 152 at 4 (Pl. App. 10).

- The two companies' personnel [
  ].  *See* IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).   Company officials from <u>Precision</u> [

  ].  *See id.*  Precision [                              ] a storage area, which [
        ].  There is no evidence that this area is divided in any manner.  IAA C.R. 178/P.R. 152 at 4 (Pl. App. 10).

- Precision and Millennium have <u>identical</u> phone and fax numbers, and websites that are laid out in nearly identical fashions.  *See* C.R. 17/P.R. 56 at Exhibit 2 (Pl. App. 6).

- The International Staple, Nail, and Tool Association ("ISANTA"), an internationally-recognized organization, treated Precision and Millennium as the same entity during the POI.  *See id.* at Exhibit 3.  At the time of the Commerce investigation, ISANTA's website listing of Precision specifically identified Millennium as a related party.  *See id.* (indicating, in the entry for Precision, "See Millennium Steel and Wire LLC").

- The ICC Evaluation Service ("ICC-ES"), which performs technical evaluations of building products, methods and materials, noted that steel nails sold in the United States that were produced at the Dubai Investment Park where Precision and Millennium are located are sold under <u>either</u> the "Millennium Steel" or "Precision Fasteners" brand name.  *See id.* at Exhibit 4.

- At the time of Commerce's investigation, one of the companies' employees identified himself as the [                                    ] on his LinkedIn account.[3]  *See* [                    ].

- In the investigation, Precision identified its executives and managers during the POI.  IAA C.R. 39/P.R. 28 at Exhibit SA-1 (Pl. App. 7).  [                        ] during the POI was [          ].  *Id.* [
        ] of <u>Millennium</u> in a September 2006 open letter regarding the construction of Millennium's facility.[4]  *See* IAA C.R. 82/P.R. 89 at Attachment 1 (Pl. App. 12).

---

[3]     The LinkedIn account was deactivated during the investigation and is no longer accessible.

[4]     In preparing the list of executives and managers, Commerce asked Precision to identify the other companies for which the executives and managers held positions.  Yet nowhere in

7

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 18 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

- [      ] shipping manifest data indicated that U.S. customers such as Hitachi Koki U.S.A. Ltd. ("Hitachi") are consignees for steel nail imports shipped from both Precision and Millennium and that these shippers have nearly identical shipping addresses. *See* C.R. 17/P.R. 56 at Exhibit 6. The [      ] data indicate that regardless of whether the steel nails sold to Hitachi were identified as coming from Millennium or Precision, they were shipped from the same street address in the industrial park where they are located. *See id.*

- As recently as [          ], shipments to the United States from Precision were marked and packaged as if Precision and Millennium are a single entity. An [          ] picture of a [              ], which is on the record, [                              ]." IAA C.R. 48/P.R. 53 at 3 and Exhibit 1 (Pl. App. 13).

### 3.    Precision and Millennium's Supply Relationship During the Period of Investigation

- For the [              ], Precision [              ] for all of its subject nail production. Precision only acquired [      ] wire-drawing machines in September 2010, and [              ]. *See* IAA C.R. 39/P.R. 28 at 8-9.

- For the <u>entire</u> POI, Precision [                              ], for the production of galvanized nails, [              ]. *See* IAA C.R. 220/P.R. 200 at 8. Galvanized nails constituted more than [      ] of Precision's sales, by volume, over the POI. IAA C.R. 97 (Pl. App. 14). *See also* IAA C.R. 220/P.R. 200 at 7, note 9.

- Contrary to Precision's repeated characterizations of its [                  ], in reality, Precision [                              ]. *See* IAA C.R. 181/P.R. 155 at 6 (Pl. App. 11).

- Precision has <u>never</u> used wire drawn by any third party [                  ]. IAA C.R. 39/P.R. 28 at 9 (Pl. App. 7).

- As noted above, Precision's [                  ]. Precision [                  ]. IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).

---

response to this question did Precision disclose the fact that [          ] was the [      ] of [                  ]. IAA C.R. 39/P.R. 28 at 4 (Pl. App. 7).

28328.6

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 19 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

Given this significant evidence, throughout the course of the investigation, Mid Continent urged Commerce to determine that Precision and Millennium were affiliated. *See, e.g.*, IAA C.R. 187/P.R. 165 (Pl. App. 9). Such a determination would have had profound effects on Commerce's analysis, because Precision had failed to report data to permit Commerce to analyze its [                    ] under the major input rule. In both the *Preliminary Determination*, IAA P.R. 118 (Pl. App. 15), and the *Final Determination*, IAA P.R. 193 at 37-38 (Pl. App. 2), however, Commerce found that Precision and Millennium were not affiliated.

### B.   Commerce's Selection of Financial Statements to Calculate Constructed Value Profit

In a market economy antidumping duty investigation, such as the case under review, Commerce generally bases its margin calculation on the respondents' normal value, calculated as the price at which the foreign like product is first sold for consumption in the exporting country or in a viable third-country market. *See* 19 U.S.C. §1677b(a)(1)(B). In this investigation, however, because neither of the respondents' home markets nor third-country markets were viable as comparison markets, Commerce based normal value on constructed value for both companies, in accordance with section 773(a)(4) of the Tariff Act of 1930, as amended (the "Act"). *See* 19 U.S.C. §1677b(a)(4).

For the purposes of initiating both the 2007-2008 investigation of steel nails from the UAE and this investigation, Commerce relied upon the ratios of Arab Heavy Industries ("AHI") to calculate ratios for factory overhead expenses, selling, general and administrative ("SG&A") expenses, financial expenses and profit. *See* C.R. 4/P.R. 10 at 15-17 (Pl. App. 16); P.R. 22 at 23,562 (Pl. App. 5) (stating that, to calculate constructed value for purposes of initiation, Commerce relied "on the most recent financial statements of <u>a company in the same general industry in the UAE as the producers of certain steel nails</u>") (emphasis added). AHI, a UAE

9

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 20 of 51

CIT Consol. Ct. No. 12-00133                        NON-CONFIDENTIAL VERSION

company, provides steel fabrication, ship repair, conversion and shipbuilding services to the marine, offshore and engineering industries, and it "operates one of the largest and best-equipped steel fabrication shops in the Gulf." IAA C.R. 112/P.R. 119 at Exhibit 1 (Pl. App. 17).

Similarly, in the *Preliminary Determination*, Commerce also relied on the 2010 financial statements of AHI to calculate constructed value profit ("CV profit") for both Dubai Wire and Precision, under section 773(e)(2)(B)(iii) of the Act. IAA P.R. 118 (Pl. App. 15). According to Commerce, AHI was an appropriate source of CV profit because it "produces products in the same general category of merchandise as nails." *Id.* at 68,134. Using this source of CV profit, Commerce calculated preliminary antidumping duty margins for respondents Dubai Wire and Precision of 27.73 percent and 19.23 percent, respectively. *Id.* at 68,135.

Following the *Preliminary Determination*, the respondents submitted numerous financial statements from additional companies for Commerce's consideration as sources of CV profit, in an effort to reduce the calculated margins. Dubai Wire submitted financial statements for two additional companies: Al Jazeera Steel Products Co. SAOG ("Al Jazeera") and Conares Metal Supply Limited ("Conares"). IAA C.R. 112/P.R. 119 at Exhibits 4 and 5 (Pl. App. 17). Precision submitted financial statements for National Metal Manufacturing and Casting Co. ("National Metal") and BILDCO. IAA P.R. 143 at Exhibits FA-1 and FA-3 (Pl. App. 19). Also on the record of the investigation were the 2010 financial statements of Global Fasteners Limited ("GFL"), an affiliate of Dubai Wire. C.R. 14/P.R. 50 at Exhibit A-9(b) (Pl. App. 20).

Unlike AHI, the production and financial experience of the companies whose financial statements respondents placed on the record – Al Jazeera, Conares, National Metal and BILDCO – bear little similarity to the respondents' experiences. Al Jazeera and National Metal are located in Oman and Saudi Arabia, respectively; thus, the experiences of those companies do not reflect

the profit experience for a UAE company.  *See* IAA P.R. 193 at 27 (Pl. App. 2).   Conares'

financial statement is not publicly available, rendering its use improper under Commerce's

"practice to use non-proprietary, publicly available financial statements when presented with

third-party financial statements." *Id.* at 29.   GFL's financial statements could not be used

because GFL was not profitable.  *Id.* at 27-29.  Finally, as discussed further below, BILDCO's

financial statement is inappropriate as a source of CV profit for respondents because BILDCO,

unlike respondents, is almost exclusively a trading company that produces no steel products.

Petitioner submitted extensive analysis on these points in its briefs before the agency.  *See* IAA

C.R. 202/P.R. 180 at 3-47 (Pl. App. 21).

In the *Final Determination*, Commerce completely changed its approach to calculating

CV profit.   Commerce rejected AHI's financial statements, upon which it had relied in the

*Preliminary Determination* as the sole source of CV profit.   Instead, Commerce relied solely

upon BILDCO's financial statements to calculate respondents' CV profit.  IAA P.R. 193 at 29

(Pl. App. 2).   In doing so, Commerce ignored a number of Mid Continent's arguments

demonstrating that AHI, and not BILDCO, was the proper source for CV profit.  Specifically,

Mid Continent presented detailed legal and factual arguments regarding the lack of raw material

inventories held by BILDCO (demonstrating its lack of manufacturing activity), *see* IAA C.R.

202/P.R. 180 at 38-39 (Pl. App. 21), and the similarity of AHI's production experience to

respondent Dubai Wire's, as demonstrated by calculated ratios of raw materials as a percentage

of operating costs, staff costs as a percentage of sales and staff costs as a percentage of operating

costs. *See id.* at 42-43.

Commerce improperly ignored these arguments in its *Final Determination*, and instead

simply stated that BILDCO's "business operations and products" appeared to be "more similar"

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 22 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

to those of respondents, despite the fact that BILDCO is almost exclusively a trading company, whose limited manufacturing experience involves cement production, and who "does not produce the steel it sells." IAA P.R. 193 at 29 (Pl. App. 2). Largely due to this change in Commerce's determination, the final antidumping duty margins of Dubai Wire and Precision fell to 6.09 percent and 2.51 percent, respectively.[5] IAA P.R. 220 (Pl. App. 3).

This appeal followed.

## V.   ARGUMENT

### A.   Commerce's Determination that Precision and Millennium Are Not Affiliated Is Not Supported by Substantial Evidence and Is Otherwise Not in Accordance with Law

#### 1.   Millennium Is in a Position to Exercise Restraint or Control over Precision

Two entities are affiliated within the meaning of section 771(33)(G) of the Act if one entity "controls" the other. 19 U.S.C. § 1677(33)(G). The Act provides that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33). The Statement of Administrative Action uses identical language. Uruguay Round Agreements Act, *Statement of Administration Action*, Vol. 1 at 838, reprinted in H.R. Doc. No. 103-316 (1994) ("SAA"). *See also Firth Rixson Special Steels Ltd. v. United States*, 27 CIT 873, 887 (2003) ("The definition of 'affiliate' under U.S. international trade law implicates operational control").

---

[5]     Commerce agreed with Mid Continent in that the financial statements of Al Jazeera and National Metal were not appropriate sources of CV profit because those companies were located outside of the UAE, and that Conares' financial statement was unusable as a CV profit source because it was proprietary. *See* IAA P.R. 193 at 27-29 (Pl. App. 2). Commerce also found that GFL's financial statements were inappropriate as a CV profit source because they had "critical flaws resulting in an unreliable profit figure." *Id.* at 27. These findings are not challenged.

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 23 of 51

CIT Consol. Ct. No. 12-00133                              NON-CONFIDENTIAL VERSION

Commerce's regulations explain the factors it considers when determining whether control exists. "In determining whether control over another person exists . . ., the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships." 19 C.F.R. § 351.102(b)(3). *See also Ta Chen Stainless Steel Pipe Co., Ltd. v. United States*, 31 CIT 794, 816 (2007). Notably, in determining whether control exists, Commerce does not require evidence of the actual exercise of control by one party over another; rather, Commerce focuses on one party's ability or capacity to control the other. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,297-98 (Dep't Commerce May 19, 1997) (final rule); *Ferro Union, Inc. v. United States*, 23 CIT 178, 192, 44 F. Supp. 2d 1310, 1324 (1999).

The potential to affect decisions concerning the production, pricing or cost of subject merchandise is an essential element of "control," as interpreted by Commerce. 19 C.F.R. § 351.102(b); *Ta Chen Stainless Steel Pipe Co., Ltd.*, 31 CIT at 817. If a "control relationship" exists between a respondent and another party, to avoid a finding by Commerce that the parties are affiliated, the respondent must demonstrate that the relationship does not have the potential to affect the subject merchandise or foreign like product. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. at 27,298. *See also Ta Chen Stainless Steel Pipe Co.*, 31 CIT at 818. When determining whether there is a significant potential for the manipulation of price or production by one entity over another, the Secretary considers whether or not the producers "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." 19 C.F.R. § 351.401(f)(1).

Overwhelming evidence on the record of this investigation indicates that Millennium has the ability or capacity to exert control over Precision, including the potential to impact decisions

13

concerning the production, pricing or cost of the subject merchandise.  Therefore, Commerce's

finding in the *Final Determination* that Precision and Millennium are not affiliated is

unsupported by substantial evidence and is otherwise not in accordance with law.[6]

As discussed above, the facts on the record clearly show that Precision and Millennium

[                                                    ], act as alter egos, transact business as if they were

the same entity, and are so intimately connected that they effectively operate as a single entity.

   a.   Precision Operates [                               ], Evidencing
        Millennium's Ability to Exert Control over Precision and the
        Parties' Affiliation

First, Precision and Millennium operate [                        ] – the companies'

buildings are in the same investment park in Dubai and, in fact, are <u>connected</u> to one another.

*See* IAA C.R. 39/P.R. 28 at 6 (Pl. App. 7).   Both companies' facilities are [

     ].  [                                    ] are performed in an "[                    ]" to

Precision's.   IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).   Precision [

                    ] – in fact, [

                    ], since it commenced nail production operations in 2008, has been

[                         ].  IAA C.R. 39/P.R. 28 at 6 (Pl. App. 7).  If Precision [

          ]. *See* IAA C.R. 95/P.R. 94 at 2.

----

[6]      As noted above, Commerce's finding that Precision and Millennium are not affiliated has significant implications for the calculation of Precision's antidumping duty margin.  If Precision and Millennium had been properly found to be affiliated parties, Commerce would have applied the major input rule, *see* 19 U.S.C. § 1677b(f)(3).  However, because Commerce found Precision and Millennium to be unaffiliated, it did not collect the information needed to properly analyze and value Precision's [                                    ] under the major input rule. Lacking this necessary information, Commerce would need to resort to facts available, or potentially adverse facts available, for the determination.  19 U.S.C. § 1677e.

The set-up of the two facilities allows for [          ] access between the two.  A gate

allows [          ] to pass between [                    ] of the building.  IAA

C.R. 178/P.R. 152 at 4 (Pl. App. 10).  In fact, Commerce's verification report demonstrates that

it is possible to [                                        ].  *See* IAA C.R.

181/P.R. 155 at 5 (Pl. App. 11).  Company officials from Precision, in fact, [


                                                       ].  *See id.*   Precision and

[                          ] a storage area, which [               ], and that appears to be

undivided.  IAA C.R. 178/P.R. 152 at 4 (Pl. App. 10).

In addition, Precision installed its [



                                                       ].  IAA C.R. 220/P.R. 200 at 16 (Pl. App.

18).  Precision and Millennium "[

]."  *Id.*  According to Precision, its machines needed to be "[

],"  which were "[                          ]".  IAA C.R. 181/P.R. 155 at 5 (Pl.

App. 11).  Although Precision [

], Precision did not [

].  *Id.*; IAA C.R. 220/P.R. 200 at 16 (Pl. App. 18).  Rather, Precision claims that

[

]."  One party's "[               ]" is another party's "close supplier."  Clearly, the

entire  physical  set-up  between  companies  is  compelling  evidence  of  operational  affiliation

between the two companies.

15

Commerce gave no credence to these facts that in its affiliation decision in the *Final Determination*.   Rather, Commerce merely stated that "Precision chose to operate from [

].""  IAA C.R. 220/P.R. 200 at 11 (Pl. App. 18).   Choices have consequences; in this case, Precision's "choice" resulted in a relationship of control, and hence, affiliation, with Millennium.   Commerce also failed to take into account the obvious implications that Millennium's [

] has on the companies' affiliation status and, in particular, Millennium's control over Precision.

Similarly, Commerce brushed aside the fact that Precision's [      ] wire-drawing machines, purchased late in the POI – which provide the company's [

] – are [                                        ].  *Id.* at 16.  Although Commerce accepted these facts (indeed, it verified them), Commerce merely stated that it was "not convinced that this [

], grants either party leverage with respect to the ability to control its counterpart."  IAA C.R. 220/P.R. 200 at 16 (Pl. App. 18).   Given the record evidence, this finding defies credulity and is unreasonable.   Commerce failed to explain the reasoning behind this finding, which is wholly at odds with the record evidence, never mind common sense.

Commerce discounted the fact that Millennium could [

], and the effect this would have on Precision's operations.   While Commerce appeared to recognize the significant challenges that [      ] would present for Precision (affecting its ability to produce and likely its costs of production and prices), *see* IAA C.R. 220/P.R. 200 at 12 (Pl. App. 18), Commerce

16

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 27 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

unreasonably dismissed such challenges as "temporary" and therefore not meaningful to the affiliation analysis, citing 19 C.F.R. § 321.102(b).

While Commerce's regulations direct it to take into account the "temporal aspect of a relationship in determining whether control exists," 19 C.F.R. § 351.102(b)(3), the Court has interpreted this to mean that "{s}poradic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control." *Hontex Enterprises, Inc. v. United States*, 27 CIT 272, 296 n. 17, 248 F. Supp. 2d 1323, 1344 n. 17 (2003). The relationship between Precision and Millennium is anything but "sporadic" or "isolated" – to the contrary, it is regular, frequent, routine, long-term and fundamental to Precision's ability to operate. It is hard to imagine the "temporary" effects on a manufacturing enterprise that is [

], or prevented from [                                    ], as anything other than catastrophic.

Clearly, the [          ], or even a [                  ], of a manufacturer [

], and [                                    ], would be more than just a temporary blip on the radar, as Commerce portrayed it. Even if Millennium were only to refuse to allow Precision to continue to [

], the record suggests that Precision would have had [

], since the [                                                    ]" that were "[                              ]" – in addition to related infrastructure required for such machines, such as reinforced concrete floors. IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11). This would have deprived Precision of its [                                    ], leaving the company [

].

17

Millennium also had [                                              ].  *See* C.R.

39/P.R. 28 at Exhibit SA-9.  Millennium could [


].  Such actions, or threats to bring it about, by [            ] gives Millennium

a meaningful ability to control Precision, including control over the production, pricing and cost

of Precision's subject production.

         b.     <u>Precision and Millennium [                    ], Further Supporting</u>
                 <u>a Determination of Affiliation</u>

Second, there is record evidence that Precision and Millennium [                    ],

which can be an important factor in Commerce's affiliation decision.  *See, e.g.*, *Hontex Enters.*

*Inc. v. United States*, 28, CIT 1000, 342 F. Supp. 2d 1225, 1227-28 and 1233 (2004).  First of all,

Millennium's [

], meaning that a [

].

Moreover, at the time of Commerce's investigation, an individual identified himself as

the [                                              ] on his LinkedIn

account.  *See* [                              ].  Were the two companies actually

unaffiliated, it is extremely unlikely that a [              ] would declare himself to be

employed by both, as a single entity.  Precision's only explanation for this individual's reported

employment status was that, although Precision did employ this individual for a [        ]

period, his LinkedIn listing "was neither authorized nor known by Precision" and was "an

inaccurate misrepresentation."  IAA C.R. 220/P.R. 200 at 3 (Pl. App. 18).  Commerce apparently

accepted Precision's explanation without question, as it somehow found this evidence "neither

18

**NON-CONFIDENTIAL VERSION**

probative nor reliable" for purposes of its affiliation determination. *Id.* at 13. To the contrary, the fact that a [

]  – [                    ] – is certainly probative, at the least, of the two companies' affiliation status.

The record contains additional evidence of another [

]. In a questionnaire response to Commerce, Precision identified its executives and managers during the POI. IAA C.R. 39/P.R. 28 at Exhibit 1 (Pl. App. 7). According to the list, [                    ] during the POI was [                    ]. *Id.*

[                                              ] of Millennium in a September 2006 open letter regarding the construction of Millennium's facility. *See* IAA C.R. 82/P.R. 89 at Attachment 1 (Pl. App. 12). Inexplicably, Commerce also did not find this fact – that [

] – as probative or relevant in any way to the issue of affiliation.

In its final analysis memorandum for Precision, Commerce simply accepted that [

]. *See* IAA C.R. 220/P.R. 200 at 12-13 (Pl. App. 18). Commerce's failure to view as evidence of affiliation the facts that Precision and Millennium [

], and that the two companies appear to have shared [

], was unreasonable.

c.     <u>Precision and Millennium Held Themselves Out to the Public as a Single, Affiliated Entity</u>

Third, Precision's and Millennium's operations were so intertwined during the POI that they held themselves out to the public as a single entity. For example, ISANTA, an

NON-CONFIDENTIAL VERSION

internationally-recognized organization of fastener-related companies, considered Precision and Millennium to be the same entity. *See* C.R. 17/P.R. 56 at Exhibit 3 (Pl. App. 6). At the time of Commerce's investigation, and during the POI, ISANTA's website listing of Precision specifically also identified Millennium as a related party. *See id.* (stating, in the Precision entry, "See Millennium Steel and Wire LLC"). Indeed, as Commerce admitted, "{f}or the entire POI, the ISANTA website states that Precision is a Millennium brand." IAA C.R. 220/P.R. 200 at 15 (Pl. App. 18).

In addition, during the POI, the ICC-ES, which performs technical evaluations of building products, methods and materials, noted that steel nails sold in the United States that were produced at the Dubai Investment Park where Precision and Millennium are located are sold under either the "Millennium Steel" or "Precision Fasteners" brand name. *See id.* at Exhibit 4. Again, Commerce was compelled to recognize this, stating, "{f}or the entire POI, Precision's nail-making business was listed in the ICC-ES report as a <u>sub-listing of Millennium</u>." IAA C.R. 220/P.R. 200 at 15 (emphasis added) (Pl. App. 18). Precision claimed that the parties intentionally listed "Precision Fasteners" as a "brand name" under "Millennium Steel & Wire" with both ISANTA and the ICC-ES [                                    ]." *See* IAA C.R. 39/P.R. 28 at 7 (Pl. App. 7).

The two companies even made [

]. As recently as [              ], [

]. Petitioner placed onto the record a picture from [

]." IAA C.R. 48/P.R. 53 at 3 and Exhibit 1 (Pl. App. 13).

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 31 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

Further, [        ] shipping manifest data indicated that significant U.S. customers such as Hitachi have imported steel nails shipped from both Precision and Millennium and that these shippers operate from the "[                    ]." IAA C.R. 203/P.R. 181 at 12 (Pl. App. 11); C.R. 17/P.R. 56 at Exhibit 6 (Pl. App. 6). The [        ] data indicate that regardless of whether the steel nails sold to Hitachi were identified as Millennium or Precision, they were shipped from the same street address in the industrial park where they are located. *See* C.R. 17/P.R. 56 at Exhibit 6 (Pl. App. 6).

In addition, Precision and [

                                                            ], IAA C.R. 95/P.R. 94 at Exhibit S4-1 (Pl. App. 8), demonstrating their intent to hold themselves out to the public as a single entity, for at least a period of time ([                ], in fact), including the entire POI. Accordingly, during the POI, Precision and Millennium had identical telephone and fax numbers, and websites that were laid out in nearly identical fashions. *See* C.R. 17/P.R. 56 at Exhibit 2 (Pl. App. 6). Given that all calls to both companies would have rung on the same telephone line, and all facsimiles would have come in over the same line, it follows that Millennium would have had access to Precision's telephone calls and facsimile transmissions.

In the face of this overwhelming evidence of affiliation, Commerce reached the unsupportable and unreasonable determination that "Precision's actions in the market seek to promote its own name as the nail maker not that nails are made by a combination of the two companies." IAA C.R. 220/P.R. 200 at 13 (Pl. App. 18). This finding is contrary to the record evidence, which clearly demonstrates that Precision and Millennium were identified as a single entity not only by major industry associations, but also [                    ]. *See* IAA C.R. 48/P.R. 53 at 3 and Exhibit 1 (Pl. App. 13). The fact that Precision and Millennium provided the

21

NON-CONFIDENTIAL VERSION

same phone and fax numbers to customers and the general public, *see* C.R. 17/P.R. 56 at Exhibit

2 (Pl. App. 6), also directly contradicts Commerce's finding that "Precision's actions in the

market seek to promote its own name," not a combination of the two companies, as the nail

maker.

    As support for its conclusion that "Precision promotes its nail-business independent of

[                                                  ]," Commerce largely relied on the <u>absence</u> of certain

information from Precision's website, which Commerce claimed demonstrates the company's

independence. *See* IAA C.R. 220/P.R. 200 at 14 (Pl. App. 18).   For example, Commerce stated

that Precision's website "does not mention that... [                                        ].   *Id.*

In Plaintiff's experience, as a matter of common business sense, a company would not advertise

on its Internet site that [                                                              ].

Because there is no reason to believe that any company would advertise on its website that [

                           ], affiliated or not, this fact does not serve as evidence of

Precision's independence.   Commerce further appeared to conclude that the listing of Precision

and Millennium as a single entity by ISANTA and ICC-ES was unremarkable, as Precision and

Millennium were [                                        ] anyway.   *Id.* at 15.   This type

of Alice-in-Wonderland approach cannot reasonably be interpreted as evidence to support

Precision's independence.

      **2.**      **Precision and Millennium Are Affiliated by a Close Supplier Relationship**

    Precision and Millennium also are affiliated due to their close supplier relationship.   The

SAA notes that the statute's current definition of control constituted a change from the prior

approach, as:

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 33 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

> {t}he traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another even in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchises or joint venture agreements, debt financing, or <u>close supplier relationships</u> in which the supplier or buyer becomes reliant upon the other.

SAA at 838 (emphasis added). *See also Chia Far Indus. Factory Co. v. United States*, 343 F. Supp. 2d 1344, 1357 (CIT 2004).

A close supplier relationship is one "in which the supplier or buyer becomes reliant upon the other." *See* SAA at 838; *Hontex Enters. v. United States*, 342 F. Supp. at 1241; *Solid Fertilizer Grade Ammonium Nitrate From the Russian Federation*, 65 Fed. Reg. 1,139, 1,142-43 (Dep't Commerce Jan. 7, 2000) (notice of preliminary determination of sales at less than fair value). *See also Mitsubishi Heavy Indus. Ltd. v. United States*, 54 F. Supp. 2d 1183, 1191 (CIT 1999) (upholding Commerce's determination that a close supplier relationship existed where the supplier depended on a single buyer for fifty percent or more of its sales during each year of a five-year period). Further, Commerce's regulations state that a close supplier relationship must have the potential to impact decisions concerning the production, pricing or cost of the subject merchandise or foreign like product. 19 C.F.R. § 351.102(b)(3).

      a.    <u>Overwhelming Record Evidence Indicates that Millennium and Precision Have a Close Supplier Relationship</u>

During the POI, Precision was [

], as well as the [                    ] as a company and manufacturer, including [                    ]. Precision was completely dependent on [

]. Without [                                    ], Precision would simply

not have been able to produce nails during the POI.

Precision [                                    ] – the [

] – during the POI.  [

] of the POI,  Precision [

] for its nail production.  In the last four months of the POI, after

Precision had purchased [        ] of its own wire-drawing machines, it still [

].

*See* IAA C.R. 220/P.R. 200 at 8 (Pl. App. 18).  By [        ], until at least [        ], Precision is

[                                    ].  IAA C.R.

95/P.R. 94 at Exhibit S4-1 (Pl. App. 8).  Precision [

] during the POI.  IAA C.R. 63/P.R. 69 at Exhibit S2D-6 (Pl. App. 22).  Over the

POI, Precision [                                    ] it used to produce

subject merchandise.  *Id.*

For galvanized nails, which constituted [        ] of Precision's sales, by volume,

over the POI, *see* IAA C.R. 97, [

] through the entire period.  Precision has never used wire drawn by any company

other than itself (post-September 2010) and [        ].  IAA C.R. 39/P.R. 28 at 9 (Pl. App.

7).  Clearly, Precision was, at least, "almost exclusively dependent" [

] for subject merchandise.

Moreover, as Commerce observed at verification, even the [        ] wire-drawing

machines that Precision does own (as of September 2010) are [

], IAA C.R. 178/P.R. 152 at 4

24

(Pl. App. 10), ostensibly in order to use the "[

                    ]." IAA C.R. 181/P.R. 155 at 5 (Pl. App. 11).  Without [                 ],

Precision is <u>physically incapable</u> of [                                        ].    According to

Precision, [

                    ]."  *Id.*  Viewed differently (and, we suggest, more accurately),

[                        ] guarantees an even greater degree of influence and control over

Precision, since it [                                        ] – "[

            ]," indeed.    [                                        ] Precision's wire-

drawing machines.  Lastly, Precision admits that it [

                    ].  IAA C.R. 39/P.R. 28 at 8-9 (Pl. App. 7).

        Thus, because of their close supplier relationship, Precision is wholly reliant on

Millennium to continue its production of subject merchandise and [

                    ].    Precision has a [

            ], which requires Precision to "[

                                        ]."  *Id.* at Exhibit SC-5.

*See id.* at 17 (noting that Precision makes "[                            ]" to "[

            ]).    Precision depends on Millennium for the [                 ]

required to meet its [                                        ].    Moreover, the [

        ] requires Precision to [

        ] during the POI.  *Id.*at Exhibit SC-5.  As noted above, Precision [


        ].  Precision would have been unable to fulfill its [

                    ], without Millennium.

As [

                                    ].  As such, their interconnected and indeed

symbiotic relationship has the potential to impact the production, pricing or cost of the subject

merchandise.  Commerce's verification of Precision confirmed this relationship.  Even beyond

the companies' interconnected [                        ] relationship, the [

                        ] is clearly one of affiliates.  Not only do the two companies

[                                        ], but Precision [

      ], as affiliated companies – [                    ] – would conduct business.  *See* IAA

C.R. 181/P.R. 155 at 6 (Pl. App. 11).  Affiliates frequently [

                        ].  *See, e.g.*, Ray H. Garrison, *Managerial Accounting:*

*Concepts for Planning, Control, Decision Making*, Sixth Edition (1991) at 471; Richard E.

Baker, Valdean C. Lembke, Thomas E. King, *Advanced Financial Accounting*, Third Edition

(1996) at 387 (Pl. App. 23).

      b.    <u>Commerce's Finding that Precision and Millennium Do Not Have</u>
<u>a Close Supplier Relationship Is Unsupported by Substantial</u>
<u>Evidence and Not in Accordance with Law</u>

Commerce made two findings, which were both unsupported by substantial evidence, to

support its determination that Precision was not reliant [                        ] and,

therefore, that Precision and Millennium do not have a close supplier relationship.

First, Commerce stated that, with the [                    ], "[

                        ], Precision can produce all types of subject merchandise."

IAA C.R. 220/P.R. 200 at 7 (Pl. App. 18).  This finding is directly contrary to the record

evidence that, oddly enough, Commerce described in the same paragraph.  *Id.* at 7-8.  The

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 37 of 51

CIT Consol. Ct. No. 12-00133                         NON-CONFIDENTIAL VERSION

evidence clearly shows that Precision [

] it used for the entire period.  *Id.*  There is

absolutely no evidence to support Commerce's "finding" that, during the POI, Precision could

have produced all types of subject merchandise [                              ].

Second, Commerce further ignored and failed to address substantial record evidence

when it concluded that, "{w}ith respect to [                     ], we... find that Precision

utilizes [          ] only for the [

]." IAA C.R. 220/P.R. 200 at 8 (Pl.

App. 18).[7]  Again, this is simply inaccurate given the evidence on the record, which shows that,

for two-thirds of the POI, Precision [

].  Precision did not purchase its own wire-drawing

machines until September 2010 and, [

].

In its close supplier relationship analysis, Commerce relied on two previous cases, which,

contrary to Commerce's conclusion, firmly support a finding that Precision and Millennium did

have a close supplier relationship during the POI.  First, Commerce stated that its practice in

analyzing potential close supplier relationships is to rely on the standard set forth in *Stainless*

*Steel Wire Rod from the Republic of Korea*, 71 Fed. Reg. 59,739, 59,739-59,740 (Dep't

---

[7]      We note that this conclusion improperly assumes that a bona fide [                    ]
existed.  As discussed above, it did not.  Rather, as Mid Continent argued, [
                                              ].  Commerce failed to
address this argument in its *Final Determination.*

Commerce Oct. 11, 2006) (preliminary results of antidumping duty administrative review) ("*Wire Rod from Korea*"); and Issues and Decision Memorandum accompanying *Stainless Steel Wire Rod from the Republic of Korea*, 72 Fed. Reg. 6,528 (Dep't Commerce Feb. 12, 2007) (final results of antidumping duty admin. review).

In *Wire Rod From Korea*, "a producer was almost exclusively dependent on a single supplier for the black coil required to produce subject merchandise." IAA C.R. 220/P.R. 200 at 7 (Pl. App. 18). Specifically, in *Wire Rod from Korea*, Commerce found that the record indicated that respondent "Dongbang {Special Steel Co., Ltd.} ha{d} not obtained suitable black coil from alternative sources but continue{d} to exclusively rely upon {Pohang Iron and Steel Co., Ltd.}/Changwon for this input." *Wire Rod from Korea* at 59,740. Moreover, "Dongbang's business operations remain{ed} considerably dependent upon the production of subject merchandise," and "there continue{d} to be a significant potential for the manipulation of price and production because these companies remain intertwined by virtue of the significant transactions between them, including sales of both {subject merchandise} and black coil for the production of {subject merchandise}." *Id.*

Although Commerce explicitly stated that its practice is to rely on the *Wire Rod From Korea* standard in analyzing close supplier relationships, Commerce made no rational or principled distinction when it reached an opposite conclusion in this case, despite an [

          ]. For [                  ], Precision did not [

]." In the [         ] of the POI, Precision continued to [

         ], and Precision's only [

         ]. Precision's business operations are "considerably dependent upon the

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 39 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

production of subject merchandise." *See* C.R. 39/P.R. 28 at 6 ("Precision's business from the outset has focused exclusively on the production and sale of steel nails"); *Wire Rod from Korea* at 59,740. And here, too, there is "a significant potential for the manipulation of price and production because these companies remain intertwined by virtue of the significant transactions between them," including [

                                ]. *See id.*  Precision also [

                                                    ]. IAA C.R. 39/P.R. 28 at Exhibit SA-7 (Pl. App. 7).

    While Commerce is permitted to depart from its established practice, it must provide a rational explanation for doing so. *See British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997) (explaining that "{a}n agency is obligated to follow precedent, and if it chooses to change, it must explain why" (internal quotations omitted)); *Tr. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 31 CIT 2040, 533 F. Supp. 2d 1290 (2007). In this case, Commerce did not. Its only bases for coming to a different conclusion than in *Wire Rod from Korea* were its unreasonable findings discussed above – that Precision can produce all types of subject merchandise [                                ], and that "Precision utilizes [          ] only for the [

                                ]." IAA C.R. 220/P.R. 200 at 7-8 (Pl. App. 18).

    Second, Commerce relied on *Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011) (final determination of sales at less than fair value) ("*Wood Flooring from the PRC*"), in determining that Precision and Millennium were not sufficiently reliant on one another to support a finding of affiliation because the parties were "willing to discontinue the relationship." IAA C.R. 220/P.R. 200 at 8-9 (Pl. App. 18).

29

Given the starkly different facts related to the affiliation issue in *Wood Flooring from the PRC*, Commerce's reliance on the case was unreasonable.   In *Wood Flooring from the PRC*, the respondent's two appointment agreements with its reselling companies "were only valid for two and three years, respectively," after which the agreements would terminate with an option for renewal.   Issues and Decision Memorandum accompanying *Wood Flooring from the PRC* at Comment 21.   The "renewal was conditioned upon the reselling companies meeting a target value of sales." *Id.*   Based on these facts, Commerce found that the respondent had an "apparent willingness to discontinue its appointment agreements." *Id.*

Here, Precision and Millennium have been [

].   First, Precision and Millennium [

], which was [

]."   IAA C.R. 39/P.R. 28 at Exhibit SA-9 (Pl. App. 7); IAA C.R. 95/P.R. 94 at Exhibit S4-1 (emphasis added) (Pl. App. 8).   Second, Precision and Millennium [

], IAA C.R. 39/P.R. 28 at Exhibit SA-4 (Pl. App. 7), which they [

].   IAA C.R. 95/P.R. 94 at Exhibit S4-1 (emphasis added) (Pl. App. 8).   And Precision and Millennium entered into the [

], and Millennium [

]." *Id.*

Commerce relied on cases in its decision that were not analogous to the facts in this investigation, while ignoring precedent, upheld by the Court, which clearly supports a finding of

30

a close supplier relationship in this case.  In *Mitsubishi Heavy Indus. v. United States*, the Court

upheld Commerce's finding of a close supplier relationship where the major input supplier

depended on the subject merchandise "for fifty percent of more of its sales during each year of a

five year period," when the POI consisted of five years.  *Mitsubishi Heavy Indus. Ltd.*, 54 F.

Supp. 2d at 1191.  Analogously, here, Precision [

                                                         ] during the POI.  IAA C.R. 63/P.R. 69 at

Exhibit S2D-6 (Pl. App. 22).  The year prior to the POI, in 2009, Precision presumably [

                                                         ], as [



                                                         ].  *See* C.R. 39/P.R. 28 at 9 (Pl. App. 7) ("Precision has

not used wire drawn by any other company").

      The facts of this case, and Commerce precedent, which has been upheld by the Court,

dictate a finding that Precision and Millennium are affiliated by a close supplier relationship.

Commerce's unreasonable conclusion to the contrary is not supported by substantial evidence

and is otherwise not in accordance with law.

               c.     <u>Commerce Erred in Focusing Its Analysis on Whether Precision<br>and Millennium Will Continue to Be Affiliated After the Period of<br>Investigation</u>

      Throughout its discussion of the affiliation between Precision and Millennium,

Commerce improperly relied on a prospective analysis – what the parties' relationship would

look like in the future, after the POI.  Commerce focused on the fact that "Precision is <u>free to</u>

<u>develop</u> the means [                                                         ] production at the [

                                                         ]" and that "Precision <u>may</u> move [

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 42 of 51

CIT Consol. Ct. No. 12-00133                          NON-CONFIDENTIAL VERSION

].”  IAA C.R. 220/P.R. 200 at 10 (emphasis added) (Pl. App. 18).  Therefore, Commerce

concluded, the “[                                                                                    ].”  *Id.*

Commerce failed to give proper significance to the fact that those “[                    ]”

occur years after the POI.  The [                              ] required Precision to [

                    ] throughout the entire POI (and for at least [            ] beyond it),

and required Precision to [                                        ] throughout the entire

POI (and for at least [            ] beyond it).  Moreover, the parties have [

            ] and [                              ] at least once, [            ], and it is

likely that they would do so again, pushing the “[                        ]” even further into the future.

The original [                                        ] contained a [

                    ].  C.R. 39/P.R. 28 at Exhibit SA-4 at 5 (Pl. App.

7).

Commerce also stated that “Precision’s ability [

                    ].”  IAA C.R. 220/P.R. 200 at 8 (Pl. App. 18).  Apart from the fact that

Precision’s [                                        ] is questionable,

Commerce’s determination must be focused on whether or not the parties were affiliated <u>during

the POI</u>, not going forward.  *See* 19 C.F.R. § 351.204(b).  As stated above, Precision did not own

any wire-drawing machinery for the majority of the POI, and it [

                    ] during the POI.  The forward-looking analysis undertaken by

Commerce was improper.  Commerce’s investigation focuses on a defined POI, and may not

base its determinations on speculative attempts to divine the future.  *See id.*

32

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 43 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

While Commerce is directed to take into account the "temporal aspect of a relationship in determining whether control exists," 19 C.F.R. § 351.102(b)(3), the Court has interpreted this "to mean that Commerce must weigh the nature of the entities' contacts over time, and must determine how such contacts potentially impact each entity's business decisions.  Sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control." *Hontex Enterprises, Inc. v. United States*, 248 F. Supp. 2d 1323, 1344 n. 17 (CIT 2003).  The situation that exists here, in which Precision relied on Millennium for [

                                      ], and continued to [

                                      ], is the antithesis of "sporadic or isolated contacts" between the entities.

Therefore, Commerce's focus on what Precision's and Millennium's relationship would look like in the post-POI period, rather than the reality of the parties' relationship during the POI, was improper and not in accordance with law.

**B.**    **Commerce's Selection of BILDCO's Financial Statements to Calculate Constructed Value Profit Is Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law**

In selecting among financial statements that are proposed as sources of CV profit under section 773(e)(2)(B)(iii) of the Act, Commerce considers "(1) similarity of the potential surrogate company's business operations and products to the respondent; (2) the extent to which the financial data of the surrogate company reflects sales in the United States as well as the home market; (3) the contemporaneity of the surrogate data to the POR; and, (4) the similarity of the customer base."  IAA P.R. 193 at 26-27 (Pl. App. 2).  *See also Geum Poong Corp. v. United States*, 26 CIT 322, 326 n. 6, 193 F. Supp. 2d 1363, 1368 n.6 (2002).  As Commerce has explained, "{t}he greater the similarity in business operations and products, the more likely that

33

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 44 of 51

CIT Consol. Ct. No. 12-00133                          NON-CONFIDENTIAL VERSION

there is a greater correlation in the profit experience of the companies." IAA P.R. 193 at 27 (Pl. App. 2).

1.    **Commerce's Use of BILDCO's Financial Statement as the Sole Source of Constructed Value Profit Was Unreasonable and Not Supported by Substantial Evidence on the Record**

As noted above, Commerce specifically found AHI to be a wholly appropriate source of CV profit, both for purposes of initiation and in the *Preliminary Determination*.   Indeed, Commerce specifically determined that AHI "produces products in the same general category of merchandise as nails." IAA P.R. 118 at 68,134 (Pl. App. 15).

Notwithstanding substantial record evidence indicating that the production and operational experience of BILDCO was fundamentally dissimilar to respondents' production and operational experiences, in the *Final Determination*, Commerce used BILDCO's financial statement to calculate CV profit, instead of the financial statement of AHI, whose operations much more closely resembled the respondents' operations and whose data unquestionably reflect the home market profit experience of a producer of comparable merchandise. IAA P.R. at 29. Commerce found that the fact that BILDCO was a "trader," which "does not produce the steel it sells," did not render its financial statements unrepresentative of subject nail producers like respondents. *Id.* Further, in the *Final Determination*, Commerce unlawfully failed to address arguments and financial analysis made by Mid Continent regarding the impropriety of using BILDCO's financial statements to calculate respondents' CV profit.

The respondents in this investigation – Dubai Wire and Precision – manufacture steel products.  When selecting sources of CV profit, Commerce's general practice is, reasonably, to attempt to match the production experience of a particular surrogate company to the production experience of the respondents.  In other words, the nature of the CV profit source company's and

34

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 45 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

the respondents' production operations are of primary importance in Commerce's selection of a CV profit source. *See* Issues and Decision Memorandum accompanying *Certain Color Television Receivers from Malaysia*, 69 Fed. Reg. 20,592 (Dep't Commerce Apr. 16, 2004) (final determination of sales at not less than fair value) at cmt. 26. Despite extensive briefing on precisely these issues, Commerce's decision failed to reflect an accurate and reasonable assessment of the potential CV profit source companies' operations relative to respondents' operations.

BILDCO's operations are completely different from the respondents'. BILDCO's consolidated financial statement demonstrates that it is almost exclusively a trading company that buys and sells various construction materials like cement products, rebar and wood. *See* IAA P.R. 143 at Exhibits FA-3 and FA-4 (Pl. App. 19). On the one hand, BILDCO's financial statement indicates that its 2010 average inventory of <u>trading goods</u> (*i.e.*, the average of 2009 and 2010 ending balances) represented <u>95 percent</u> of total inventories. On the other hand, <u>raw materials</u> (presumably inputs for cement production, and perhaps some rebar to be cut into pieces) represented <u>less than 1 percent</u> of BILDCO's total inventories. *See id.* at Exhibit FA-3. Thus, BILDCO's available financial data overwhelmingly reflect the profit experience of a <u>trading company</u>, not a manufacturer of steel products like respondents.

BILDCO does not produce subject merchandise. In fact, BILDCO does not manufacture any type of steel product. Although it appears that BILDCO cuts and bends some quantity of rebar, it does not <u>produce</u> rebar, and it does not <u>fabricate</u> anything of steel, whether from rebar or anything else. As Commerce acknowledged, "BILDCO does not produce the steel it sells… ." IAA P.R. 193 at 29 (Pl. App. 2). BILDCO's website and financial statements indicate that sales of imported and local rebar (which BILDCO does not itself manufacture) constituted

35

approximately 91 percent of its sales in 2009. *See* IAA P.R. 143 at Exhibits FA-3 and FA-4 (Pl. App. 19).[8] There is no evidence on the record that any of the rebar included in the 91 percent sales figure was further processed in any way by BILDCO. Sales of cement products, which BILDCO does produce, represented just five percent of BILDCO's 2009 sales. *See id.* Thus, given that 96 percent of its revenues are from trading activities – *i.e.*, purchasing goods and then reselling them for a profit – and from sales of cement (not steel products it manufactures) it is apparent that BILDCO does very little manufacturing of any kind, and what little it does is overwhelmingly of cement products. The company's financial statement demonstrates that its business activities and financial performance have nothing to do with the production of steel nails or any comparable merchandise. Thus, BILDCO's financial statement clearly does not capture or otherwise appropriately approximate the respondents' home market profit experience.

Therefore, it was manifestly unreasonable for Commerce to use BILDCO's financial statements. The unreasonableness of Commerce's decision is highlighted by the fact that the record contained financial statements for AHI, a UAE company that *Commerce specifically found "produces products in the same general category of merchandise as nails."* IAA P.R. 118 at 68,134 (emphasis added) (Pl. App. 15). Commerce relied on AHI's financial statements to initiate the 2007-2008 investigation on steel nails from the UAE, to initiate the investigation before the Court, and in the *Preliminary Determination* for this investigation. *See* C.R. 4/P.R. 10 at 15-17 (Pl. App. 16); P.R. 22 at 23,562 (Pl. App. 5) (stating that, to calculate constructed value for purposes of initiation, Commerce relied "on the most recent financial statements of a company in the same general industry in the UAE as the producers of certain steel nails").

---

[8]      BILDCO's website indicates that it sells about AED 785 million in imported and local steel bars annually. IAA P.R. 143 at Exhibit FA-4 (Pl. App. 19). According to BILDCO's financial statements, 2009 total sales were approximately AED 859 million. *Id.* at Exhibit FA-3.

Case 1:12-cv-00133-GWC   Document 35   Filed 10/16/12   Page 47 of 51

CIT Consol. Ct. No. 12-00133                    NON-CONFIDENTIAL VERSION

Given that AHI "produces products in the same general category of merchandise as nails," AHI's financial statement clearly "relates more closely to the production of merchandise that is in the same general category of products as the subject merchandise" than BILDCO's. *See* Issues and Decision Memorandum accompanying *Electrolytic Manganese Dioxide from Australia*, 73 Fed. Reg. 47,586 (Dep't Commerce Aug. 14, 2008) (notice of final deter. of sales at less than fair value and termination of critical-circumstances investigation) at Comment: Profit for Constructed Value.

Unlike BILDCO, which is almost exclusively a trading company, AHI's principal activities, according to its audited financial statement, are making things out of steel: steel fabrication and ship repair. *See* C.R. 4/P.R. 10 at Exhibit 14 at 8 (Pl. App. 16). AHI's audited financial statement does not identify revenues earned or operating expenses incurred from any activity other than steel fabrication and ship repair. *Id.* at Exhibit 14 at 4 and 25.

AHI's website also specifically identify steel fabrication as one of its activities. The website states that "AHI operates one of the largest and best-equipped fabrication shops in the Gulf. The fabrication shop comprises 9,000 square-meter (sqm) covered workshop and a 75,000 sqm open fabrication area." IAA C.R. 112/P.R. 119 at Exhibit 1 (Pl. App. 17). The website further states that "AHI has earned the reputation of being a quality fabrication yard in the region," and that AHI's "track record in fabrication includes" platforms, barges, ducts, silos, and kilns, as well as the "rolling and fabrication of pipes." *Id.* This company makes things out of steel, unlike BILDCO.

Given the stark differences between the business operations of BILDCO and the respondents, and the fact that the record contained AHI's financial statement, and that Commerce had already found AHI to produce merchandise in the same general category as steel

37

nails, Commerce's use of BILDCO's financial statement was manifestly unreasonable and unsupported by substantial evidence. *See Tianjin Magnesium Int'l Co., Ltd. v. United States*, 34 CIT __, __, 722 F. Supp. 2d 1322, 1340 (2010) ("{The Court's} review is limited to sustaining Commerce if one could reasonably conclude that Commerce chose the best available information, even if the Court would have chosen other data. However, there is no clear indication that Malco's flawed financial statement is significantly better than the rejected surrogates. Commerce failed to meet its obligation to satisfactorily explain its decision").

> **2.    Commerce Failed to Address Several of Mid Continent's Arguments with Regard to the Selection of a Constructed Value Profit Source, Rendering the Decision Not in Accordance with Law**

Significantly, many of the arguments made by Mid Continent undermining the use of BILDCO and supporting the use of AHI as a source of CV profit were not addressed or even considered by Commerce in its *Final Determination, see* IAA P.R. 193 at 21-29 (Pl. App. 2), rendering the *Final Determination* arbitrary and contrary to law. Commerce failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1993). *See also Tianjin Magnesium Int'l Co. v. United States*, 34 CIT at __, 722 F. Supp. at 1340. Commerce's failure to explain its decision is especially arbitrary given the stark change in its decision in the *Final Determination* from the *Preliminary Determination*, as it did not provide an adequate rationale for the change. *See, e.g., WelCom Prods., Inc. v. United States*, Consol. Ct. No. 11-00370, Slip. Op. 12-124 (Sept. 27, 2012).

In the Issues and Decision Memorandum for the *Final Determination*, Commerce spends about seven paragraphs explaining why it is not choosing the other financial statements on the record to calculate CV profit. It then devotes one paragraph to its discussion of why BILDCO's

financial statement is the best choice for a CV profit source. *See* IAA P.R. 193 at 21-29 (Pl. App. 2). Unsurprisingly, Commerce's brief and conclusory discussion did not analyze many of the arguments raised by Mid Continent with regard to CV profit source selection.

Specifically, Commerce did not discuss the extremely low level of BILDCO's inventory that is composed of raw materials. *See* IAA C.R. 202/P.R. 180 at 39 (Pl. App. 21); IAA. P.R. 193 at 29 (Pl. App. 2). In addition, Mid Continent provided detailed analysis and comparisons of respondent Dubai Wire's and AHI's ratios of raw materials as a percentage of total operating costs, ratios of staff costs as a percentage of sales, ratios of staff costs as a percentage of operating costs, and plant, equipment and structures ratios. *See* IAA C.R. 202/P.R. 180 at 42-43 (Pl. App. 21). For example, Mid Continent calculated staff costs as a percentage of sales for AHI, DWE and GFL (DWE's affiliate, and also a producer of fasteners). In 2009, AHI's staff costs as a percentage of sales were 9 percent, DWE's were [ ] percent, and GFL's were [   ] percent. In 2010, AHI's staff costs as a percentage of sales were 21 percent, while DWE's were [ . ] percent, and GFL's were [   ] percent. *See* IAA C.R. 202/P.R. 180 at 42-43 (Pl. App. 21). Mid Continent also demonstrated that AHI's ratios of plant and equipment (including buildings and structures) were [          ] to DWE's. *Id.* at 43. Commerce failed to address these arguments in its *Final Determination*. *See* IAA. P.R. 193 at 29 (Pl. App. 2).

Therefore, the Court should conclude that Commerce's use of BILDCO's financial statement to calculate respondents' CV profit in the *Final Determination* was not supported by substantial evidence nor in accordance with law.

## VI.   CONCLUSION

For the foregoing reasons, Mid Continent respectfully requests that the Court find that the following determinations by Commerce are not supported by substantial evidence and/or not in

39

accordance with law: 1) Commerce's determination that Precision and Millennium are not affiliated, in spite of significant record evidence to the contrary; and 2) Commerce's decision to rely on the financial statements of BILDCO, a company that is entirely dissimilar from respondents, as the source of CV profit.   Therefore, Mid Continent requests that the Court remand these determinations to Commerce for further consideration in accordance with the discussion above.

Respectfully submitted,

Adam H. Gordon
Robert E. DeFrancesco
Laura El-Sabaawi

*Counsel for Plaintiff Mid Continent Nail Corporation*

October 16, 2012

28328.6

## CERTIFICATE OF SERVICE

*Mid Continent Nail Corporation v. United States*
Court No. 12-00133
United States Court of International Trade

I certify that a copy of this document was served on the following parties, via first class mail on October 16, 2012.

**On behalf of Dubai Wire FZE and Itochu Building Products Co., Inc.:**

Bruce M. Mitchell, Esq.
**Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP**
399 Park Avenue
25th Floor
New York, NY 10022

**On behalf of Precision Fasteners, LLC:**

Michael P. House, Esq.
**Perkins Coie, LLP**
700 13th Street, NW
Suite 600
Washington, DC  20005

**On behalf of the United States:**

Carrie Anna Dunsmore
Civil Division
Commercial Litigation Branch
**U.S. Department of Justice**
1100 L Street, NW
Washington, DC  20005