Slip Op. 15-122

UNITED STATES COURT OF INTERNATIONAL TRADE

-----------------------------------------------------------------x
MID CONTINENT NAIL CORPORATION,    |

           Plaintiff,       |

    v.                |

UNITED STATES,            |      Before:  Gregory W. Carman, Judge

           Defendant,     |      Consol. Court No. 12-00133

    and               |

DUBAI WIRE FZE and ITOCHU BUILDING    |
PRODUCTS CO., INC., and PRECISION   |
FASTENERS, LLC,           |

           Defendant-Intervenors.  |
-----------------------------------------------------------------x

## OPINION AND ORDER

[Affirming the results of the remand redetermination in Commerce's antidumping duty investigation of certain steel nails from the United Arab Emirates.]

Dated: November 3, 2015

*Andrew W. Kentz, David A. Yocis, Michelle Li,* and *Roop Kiran Bhatti,* Picard Kentz & Rowe LLP, of Washington, DC, for plaintiff Mid Continent Nail Corporation. With them on the briefs were *Jordan C. Kahn* and *Nathan W. Cunningham* of Picard Kentz & Rowe LLP.

*Carrie A. Dunsmore*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant United States. With her on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Melissa M. Brewer*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Bruce M. Mitchell*, *Mark E. Pardo*, *Ned H. Marshak*, and *Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for defendant-intervenors Dubai Wire FZE and Itochu Building Products Co., Inc.

*Michael P. House, Sabahat Chaudhary, David J. Townsend,* and *David S. Christy, Jr.,* Perkins Coie LLP, of Washington, DC, for defendant-intervenor Precision Fasteners, LLC.

Carman, Judge: This consolidated case is currently before the Court for resolution of challenges to the *Final Results of Redetermination Pursuant to Court Remand*, ECF Nos. 118 (confidential version) and 119 (public version) (hereinafter "*Remand Results*") issued by the U.S. Department of Commerce ("Commerce" or "the government").

The remand resulted from an order issued by the Court on June 26, 2014. *Mid Continent Nail Corp. v. United States,* 38 CIT ___, 999 F. Supp. 2d 1307 (2014). That order upheld most aspects of *Certain Steel Nails From the United Arab Emirates*, 77 Fed. Reg. 17,029 (Dep't of Commerce Mar. 23, 2012) (final determination) ("*Final Results*"), *as amended*, 77 Fed. Reg. 27,421 (Dep't of Commerce May 10, 2012) (am. final determination and antidumping duty order), and the unpublished Issues and Decisions Memorandum incorporated by reference, *see* Issues and Decisions Mem. for the Less Than Fair Value Investigation of Certain Steel Nails from the United Arab Emirates, A-520-804 (Mar. 19, 2012), *available at* http://enforcement.trade.gov/frn/summary/uae/2012-7067-1.pdf (last visited October 2, 2015) ("*I&D Memo*"). However, the Court determined that Commerce had failed to apply a regulation that it had improperly withdrawn without notice and comment, and thus remanded the case with instructions for Commerce to apply the former regulation. 999 F. Supp. 2d at 1323. Because that change could result in significant differences in Commerce's targeted dumping analysis, the Court deferred ruling on other challenges to that aspect of the *Final Results*. *Id.* at 1323-24.

Commerce has now issued its *Remand Results,* and each of the parties has submitted its comments. The comments have raised a number of objections to the *Remand Results*, all centered on aspects of the targeted dumping analysis that Commerce conducted. The Court addresses these issues below, and upholds the *Remand Results* in full as supported by substantial evidence and in accordance with law.

## Background

Plaintiff in this consolidated action is domestic nail producer Mid Continent Nail Corporation ("MCN" or "Plaintiff"). Defendant-Intervenors Dubai Wire FZE and Itochu Building Products Co., Inc. (collectively "Dubai Wire" or "DWE") and Precision Fasteners, LLC ("Precision") are producers of subject merchandise from the UAE.[1]

In the Court's prior opinion, the Court upheld the aspects of the *Final Results* that determined that (a) Precision was not affiliated with a company called Millennium; (b) certain financial statements would be used for surrogate profit values; and (c) a particular interest rate would be imputed to a loan extended to Dubai Wire. *See generally Mid Continent Nail,* 999 F. Supp. 2d 1307.

The Court, however, determined that Commerce had improperly applied the law governing what is commonly called "targeted dumping." Pursuant to 19 U.S.C.

---

[1] MCN filed this action under Court No. 12-00133, and Dubai Wire and Precision entered Court No. 12-00133 as Defendant-Intervenors as of right. Separately, Dubai Wire and Precision filed their own challenges to the investigation; Dubai Wire is therefore the plaintiff in Court No. 12-00153 and Precision is the plaintiff in Court No. 12-00162. The cases filed by Dubai Wire and Precision are now consolidated with the current case filed by MCN.

§ 1677f-1(d)(1)(A), Commerce "shall determine whether the subject merchandise is being sold

in the United States at less than fair value" in one of two ways: by comparing "the weighted

average of the normal values to the weighted average of the export prices (and constructed

export prices) for comparable merchandise," or by comparing "the normal values of individual

transactions to the export prices (or constructed export prices) of individual transactions for

comparable merchandise." These price comparison methods are commonly called average-to-

average ("A-A") and transaction-to-transaction ("T-T"). The statute contains an exception to this

general rule regarding price comparisons. Commerce "may" make its determination regarding

sales at less than fair value "by comparing the weighted average of the normal values to the

export prices (or constructed export prices) of individual transactions for comparable

merchandise" if two conditions are satisfied:

> (i) there is a pattern of export prices (or constructed export prices) for
> comparable merchandise that differ significantly among purchasers, regions, or
> periods of time, and
> (ii) [Commerce] explains why such differences cannot be taken into account
> using [average-to-average or transaction-to-transaction price comparisons].

19 U.S.C. §1677f-1(d)(1)(B). Such a pattern of export prices is commonly called targeted

dumping, and the comparison method that may be used in this context is termed average-to-

transaction ("A-T").

     In 1997, Commerce promulgated a regulation interpreting this statutory authority, in

relevant part, in the following manner:

> (f) Targeted dumping—

>     (1) In general. . . . the Secretary may apply the average-to-transaction
> method . . . in an antidumping investigation if:

> (i) As determined through the use of, among other things, standard and appropriate statistical techniques, there is targeted dumping in the form of a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time; and
>
> (ii) The Secretary determines that such differences cannot be taken into account using the average-to-average method or the transaction-to-transaction method and explains the basis for that determination.
>
> (2) Limitation of average-to-transaction method to targeted dumping. Where the criteria for identifying targeted dumping under paragraph (f)(1) of this section are satisfied, the Secretary normally will limit the application of the average-to-transaction method to those sales that constitute targeted dumping under paragraph (f)(1)(i) of this section.

19 C.F.R. § 351.414(f) (1997). (Subsection (2) of this regulation will be referred to as the

"*Limiting Regulation*.") In 2008, Commerce published a Federal Register notice stating that this

targeted dumping regulation was being withdrawn. *Withdrawal of the Regulatory Provisions*

*Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't

of Commerce Dec. 10, 2008) ("*Withdrawal Notice*"). Although Commerce indicated that it

would accept post-publication comments regarding the withdrawal, the withdrawal was given

immediate effect. *Id.* It was this purported withdrawal of the *Limiting Regulation* that the Court

found to be unlawful in its June 26, 2014 order; the Cout consequently instructed Commerce to

apply 19 C.F.R. § 351.414(f) on remand in the manner in which the regulation had been applied

prior to the *Withdrawal Notice*. 999 F. Supp. 2d at 1323.

    The Court also noted in its June 26, 2014 order that Commerce did not address "whether

or not the transaction-to-transaction method would have been able to account for the targeted

dumping," and stated that Commerce should "state its rationale . . . in the redetermination." *Id.* at

1324 n.5.

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c). When

reviewing the results of a remand, the Court examines the decision "for compliance with the

court's remand order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274, 587

F. Supp. 2d 1303, 1306 (2008). Factual findings of Commerce in the *Remand Results* will be

upheld unless unsupported by substantial evidence on the record, while legal determinations will

be upheld unless not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *see also* 8A West's

Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Substantial evidence is "more than a mere scintilla," amounting to "such relevant

evidence as a reasonable mind would accept as adequate to support a conclusion." *NSK Corp. v.

U.S. Int'l Trade Comm'n*, 716 F.3d 1352, 1364 (Fed. Cir. 2013) (internal citations and quotations

omitted). In assessing substantial evidence, the court determines whether the reviewed agency

decision is reasonable given the record as a whole, "even if some evidence detracts from the

[agency's] conclusion." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir.

2006).

In assessing whether Commerce's determination of a legal question is in accordance with

law, "[t]he statute is the starting point . . . . The agency's action must be authorized by the

statute, and consistent with the agency's regulations." West's Fed. Forms, National Courts,

*supra; see Ningbo Dafa Chem. Fiber Co. v. United States,* 580 F.3d 1247, 1253-54 (Fed. Cir.

2009). When Commerce interprets the antidumping statute, the Court's review of Commerce's

determination is conducted under the two-step framework of *Chevron, U.S.A., Inc. v. Natural*

*Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984); *see Ningbo Dafa,* 580 F.3d at 1253-54.

The Court defers to Commerce's interpretation unless there is "unambiguous statutory language

to the contrary" or Commerce has reached an "unreasonable interpretation of language that is

ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). Unless Commerce's

interpretation of ambiguous language in the statute is "arbitrary, capricious, or manifestly

contrary to the statute," the court will not set it aside. *Chevron*, 467 U.S. at 844.

DISCUSSION

## I.   <u>Remand Results</u>

In the *Remand Results,* Commerce applies (under protest[2]) the *Limiting Regulation* and

continues "to find that for both DWE and Precision, there was a pattern of export prices (or

constructed export prices) for comparable merchandise that differed significantly among U.S.

customers, regions, and time periods during the period of investigation." *Remand Results* at 6.

---

[2] Commerce cites *Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003) to explain why it files the *Remand Results* under protest. In *Viraj Group*, the Federal Circuit held that Commerce, despite technically having prevailed below, had standing to appeal after the Court of International Trade upheld its remand redetermination since the remand redetermination was issued only pursuant to court order and under protest. *See id.* at 1374-77. Commerce's filing of the *Remand Results* here "under protest" appears solely intended to preserve its ability to seek appellate review. The Court of International Trade has stated that "[t]he only legitimate purpose of registering a protest in a remand determination is to preserve a particular issue for appeal where the agency has been compelled to take a particular step that results in an outcome not of its choosing." *GPX Int'l Tire Corp. v. United States*, 37 CIT ___, ___, 942 F. Supp. 2d 1343, 1348 n.2 (2013). Commerce has lodged such a legitimate protest here.

This finding is based on the results of what Commerce refers to as "the *Nails* test" an analytic framework Commerce applied in targeted dumping investigations during the time period applicable to this case. Def.'s Resp. to Pl.'s and Def.-Intervenor's Comments on the Remand Redetermination ("*US Response*"), ECF No. 138, at 3.[3] The *Nails* test is a two-step methodology. Commerce first analyzes the prices of allegedly targeted sales to identify whether more than 33% of the sales were priced more than one standard deviation below the weighted-average price of all sales. *Id.* This is the "standard deviation" test. Where such a price pattern is found, Commerce moves to the second step, known as the "gap test." At this step, Commerce "examines all sales of subject merchandise by the respondent to the allegedly targeted group which passed the first stage of the *Nails* test," "determines the total volume of sales for which the difference between the weighted-average price of sales to the allegedly targeted group and the next higher weighted-average price of sales to a non-targeted group exceeds the average price gap (weighted by sales volume) for the non-targeted groups," and concludes, if "the volume of the sales that meets this test exceeds five percent of the total sales volume of subject merchandise to the allegedly targeted," that the sales pass the *Nails* test. *Id.* at 3-4. This methodology is the means by which Commerce affirmatively finds targeted dumping by Dubai Wire and Precision on remand. *Id.* at 6.

---

[3] The *Nails* test originated with *Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (final determination of sales at less than fair value), which was upheld by the Court of International Trade in *Mid Continent Nail v. United States*, 34 CIT ___, 712 F. Supp. 2d 1370 (2010).

Commerce examines the dumping margins calculated for Dubai Wire and Precision using A-A comparison against the margins calculated using A-T comparison (limited to the allegedly targeted sales in accordance with the *Limiting Regulation*). *Id.* Because the margin for Precision is *de minimis* regardless of which methodology is applied, Commerce determines that the pattern of pricing differences can be taken account of using the standard A-A comparison method, without resorting to A-T comparison. *Id.* A rate of 0.00% is calculated for Precision.[4] *Id.* However, the margin calculated for Dubai Wire is *de minimis* using A-A comparison, but above the *de minimis* threshold using A-T comparison. *Id.* Commerce therefore finds that Dubai Wire's pattern of pricing differences cannot be accounted for using A-A comparison, and applies A-T comparison, resulting in a weighted-average dumping margin for Dubai Wire of 2.68%. *Id.*

Commerce also decides that examining whether to use T-T comparison is unnecessary and that, in any case, T-T comparison is unwarranted under the facts of the case. *Remand Results* at 3-6. Commerce bases this decision on an interpretation of 19 U.S.C. §1677f-1(d)(1)(B) that sees the statute as mandating only that Commerce explain, before using A-T comparison, why *one* of the statutorily-preferred comparison methods (A-A or T-T) cannot account for the targeted dumping pattern. *Id.* at 3-4. In Commerce's view, "[a]n interpretation of the statute by which the Department would be required to explain why both the [A-A] and the [T-T] methods cannot account for such differences would read into the statute's express terms a requirement

---

[4] Precision urges the Court to uphold the *Remand Results*. *See generally* Pl./Def.-Intervenor Precision Fasteners' Comments on Remand Results, ECF No. 125. Precision correctly notes that because its "dumping margin is *de minimis*, the additional issues raised by Precision are rendered moot and need not be considered by the Court in affirming" the *Remand Results*. *Id.* at 3.

that is not present." *Id.* at 4. Commerce bases this on the language of the statute, which requires

that before employing A-T comparison, Commerce "explains why such differences [i.e. the

targeted dumping differential price patterns] cannot be taken into account using a method

described in paragraph (1)(A)(i) [i.e. A-A comparison] or (ii) [i.e. T-T comparison]." 19 U.S.C.

§ 1677f-1(d)(1)(B)(ii). Commerce sees the use of "a method" and "or" in this clause as giving

Commerce the discretion to choose a preferred method from the options given (A-A and T-T),

and mandating only that Commerce check whether its preferred method accounts for the targeted

dumping pattern when considering whether to use A-T comparison. *Remand Results* at 3-4.

    As support for this view of the statute, Commerce references the Statement of

Administrative Action ("SAA") issued by Congress in conjunction with the passage of the

Uruguay Round Agreements Act, as well as several of Commerce's regulations. In particular,

Commerce focuses on statements in the SAA that Commerce will use T-T comparison "far less

frequently" than A-A comparison given its "past experience with this methodology" and the

"difficulty in selecting appropriate comparison transactions." *Id.* at 5 (citing Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1, at 842-843

(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178.) The SAA also indicates that T-T

comparison will be appropriate where "there are very few sales and the merchandise sold in each

market is identical or very similar or is custom made." SAA at 842-43.

    Commerce notes that there are a "substantial number of sales" here. *Remand Results* at 5.

Commerce also notes that price volatility, a consideration that may favor use of T-T

comparisons, is not "present with respect to DWE's and Precision's sales." *Id.* at 6. As a result,

Commerce finds that "use of the [T-T] method is inappropriate[.]" *Id.*

 In reviewing the *Remand Results*, the Court must defer to Commerce's interpretation of

its statute unless there is "unambiguous statutory language to the contrary" or Commerce has

reached an "unreasonable interpretation of language that is ambiguous." *Eurodif S.A.*, 555 U.S.

at 316. The language requiring Commerce to explain why the pattern of price differences

"cannot be taken into account using a method described in paragraph (1)(A)(i) [i.e. A-A

comparison] or (ii) [i.e. T-T comparison]" seems to the Court to be most naturally read, in

context, as requiring Commerce to eliminate both of the statute's standard comparison methods

before applying A-T comparison. However, Commerce identified an alternative reading that

shows that the language is ambiguous—i.e., open to two different interpretations. The Court

cannot say that Commerce's interpretation of this ambiguous language is unreasonable, since

Commerce supports its interpretation with the SAA. The Court therefore determines that

Commerce's interpretation of 19 U.S.C. § 1677f-1(d)(1)(B) is entitled to *Chevron* deference and

is in accordance with law. The Court also determines that substantial evidence supports

Commerce's application of the statute here, since Commerce has reasoned that T-T methodology

is inappropriate where, as here, there are a large number of sales and no concerns such as price

volatility. The Court therefore upholds the *Remand Results* in this respect.

## II. <u>The Objections of MCN Are Without Merit</u>

 MCN objects to the *Remand Results*. *See generally* Mid Continent Nail Corp.'s

Comments on Final Results of Redetermination Pursuant to Court Remand ("*MCN Comments*"),

ECF No. 126. MCN argues that the Court's remand order merely required Commerce to apply

19 C.F.R. § 351.414(f)  as it existed prior to the *Withdrawal Notice*, but did not require

Commerce to interpret that regulation such that A-T comparison would only apply to sales found

to be targeted. *Id.* at 1-2, 7-8. MCN contends that Congress intended Commerce to apply A-T to

all sales where necessary to deal with masked dumping, so "it would clearly be opposed to the

intent of Congress for Commerce to ignore the existence of masked dumping and refuse to apply

the A-T methodology" in such a situation. *Id.* at 7. The proper reading of the *Limiting Regulation*

according to MCN is that where targeting—a pattern of sales differing in price among customer,

time period, or region—exists, *all* sales that comprise that pattern, not solely the low-priced

sales. *Id.* at 8-9. MCN contends that Commerce "acted arbitrarily and contrary to the Court's

instructions" in failing to apply the *Limiting Regulation* in a manner consistent with this view. *Id.*

at 13; *see also id.* at 12. MCN also argues that substantial evidence on the record shows that

targeted dumping was so extensive and masked that it was unreasonable to segregate targeted

and untargeted sales, so the A-T methodology should have been applied to all sales pursuant to

the *Limiting Regulation*. *See id.* at 13-20. The evidence that MCN cites consists of the

differences in weighted average dumping margins resulting from application of the A-A and A-T

methods to the respondents. *See id.* at 13-16. From this, MCN claims that Commerce should

have determined that it was appropriate to apply A-T comparison beyond the limited realm of the

sales identified as targeted. Finally, MCN claims that the *Nails* test does not identify the set of

targeted sales, but simply identifies whether targeting occurred. *See id.* at 20-22. MCN argues

that Commerce improperly failed to evaluate whether targeting was so extensive as to require A-T comparisons for all sales, instead relying on the under-inclusive *Nails* test. *See id.* at 22-23.

Commerce responds that it considered whether the record supported deviation from "normal" application of the *Limiting Regulation*, and determined that it did not. *US Response* at 8, citing *Remand Results* at 6-7. Commerce notes that MCN's extensive discussion of the statute and the regulatory framework around targeted dumping is generally consistent with the current views of Commerce, which are the views that led Commerce to issue the *Withdrawal Notice* invalidated by the Court's remand order. *Id.* at 8-9. However, Commerce was required on remand to apply the *Limiting Regulation* and did so in a manner consistent with both the remand order and the language of the regulation. *Id.* at 9. On remand, Commerce considered the record and determined that no evidence made it appropriate to deviate from the normal application of the *Limiting Regulation. Id.,* citing *Remand Results* at 13-18. Commerce also argues that MCN has not provided any rationale to support its argument that a comparison of the results of the various comparison methodologies is an appropriate basis for determining whether the "normal" application of the *Limiting Regulation* should apply. *Id.* at 10-12. Commerce also rejects MCN's argument that targeting was so extensive that targeted sales could not practically be segregated from non-targeted sales, and that the A-T comparison method should therefore have applied more broadly. *Id.* at 12-13. Commerce conducted an analysis of sales data to determine whether the *Nails* test was improperly limiting its determination of how widespread targeting was in the sales. *Id.* at 13-14. The results showed that the volume of sales not tested under the *Nails* test was insignificant. *Id.* at 15.

The Court finds that Commerce has complied with the remand order by applying the *Limiting Regulation* as it would have done had the invalid *Withdrawal Notice* not been issued. To the extent that MCN argues that the government adopted an inappropriately narrow view of its authority under the *Limiting Regulation*, and inaccurately construed the remand order as a cover for doing so, MCN is mistaken (and Commerce is correct) about the remand order.

Much of MCN's argument must be rejected because it is based on the notion that Commerce was required to exercise its interpretive discretion over the statute and its own *Limiting Regulation* in a particular manner. But the language of the statute and the *Limitation Regulation* explicitly grant Commerce broad discretion in the context of applying a remedy to targeted dumping. The statute says that Commerce "may" employ A-T comparison in the targeted dumping context. 19 U.S.C. § 1677f-1(d)(1)(B). The *Limiting Regulation* also incorporates a certain amount of the flexibility that is characteristic of discretion when it states Commerce "*normally* will limit the application of the average-to-transaction method to those sales that constitute targeted dumping[.]" 19 C.F.R. § 351.414(f)(2) (emphasis added). The statutory use of "may" is an especially strong counterpoint to MCN's contention that Commerce acted illegally in failing to apply A-T comparison more broadly, since the statute leaves to Commerce the choice of whether to apply A-T, even when evidence of targeted dumping permits doing so. To the extent that Commerce's *Remand Results* adopted a different interpretation of the statute than the one MCN preferred, the Court upholds the *Remand Results*.

Finally, MCN's argument that the *Remand Results* are unsupported by substantial evidence fails. Commerce took MCN's contentions seriously and conducted detailed analysis of

the record data to ascertain whether or not the *Nails* test was distorting its understanding of how

extensive targeting was in this case, but the results of that analysis were negative. Commerce

examined the evidence for other indicators that the normal application of the *Limiting Regulation*

should be put aside, but found none. These determination were certainly supported by more than

a scintilla of evidence, and were reasonable in light of the record as a whole. The Court therefore

upholds the *Remand Results* over MCN's challenges.

III.     **The Objections of Dubai Wire Are Without Merit**

    A.     **Dubai Wire's Arguments**

    Dubai Wire argues that Commerce committed reversible error in finding targeting by

time period based on increases in Dubai Wire's prices over the period of investigation ("POI").

Dubai Wire FZE, et al, Comments in Resp. to the Dep't of Commerce's Final Results of

Redetermination (*Dubai Wire Comments*) at 4-11, ECF No. 123. Dubai Wire contends that these

price increases were directly related to increased costs, avoided dumping by maintaining prices

above cost of production, and that it was therefore improper to use them as a basis for a finding

of unfair trade in the form of targeted dumping. *Id.* at 5-6. Contending that Commerce must

make its decisions based on the commercial realities surrounding a case, Dubai Wire claims that

Commerce has acted unreasonably in applying its mathematical dumping analysis without

considering *why* Dubai Wire's pricing fell into the observed patterns. *Id.* at 6-7. Noting that

Commerce verified its cost and sale data, Dubai Wire claims that record evidence establishes a

correlation between surging costs for wire rod (making up nearly all of Dubai Wire's input) and

increasing nail prices. *Id.* at 8-9. Dubai Wire attacks Commerce's claim that its cost increases

over the POI were not significant enough to require adjustment to the targeted dumping analysis,

which Commerce based on the 25% increase Commerce requires to calculate constructed value

costs over a shorter period than the entire POI. *Id.* at 10. Dubai Wire claims there is no reason to

link this unrelated test to the targeted dumping analysis, since price increases below 25% can

lead to a finding of targeted dumping and the exporter should be allowed to justify its price

increases by showing related cost increases. *Id.*

   Dubai Wire claims that Commerce erred when it determined that Dubai Wire had

engaged in targeting by customer and by region. *Id.* at 11-15. Dubai Wire argues that these

findings were based on a miniscule percentage of total sales, which did not constitute a

"commercially recognizable" pattern and should, in Dubai Wire's view, be considered *de*

*minimis* (and therefore be ignored) by Commerce. *Id.* at 12. According to Dubai Wire,

Commerce's rejection of this proposed *de minimis* standard for the targeting analysis was

contrary to several recent Commece decisions, yet Commerce did not justify applying a different

standard. *Id.* at 14-15.

   Dubai Wire also claims that Commerce erred in treating certain low-priced sales, made to

three customers, as targeted despite the fact that two of these customers purchased "second

quality, non-prime goods" sold "at a discounted price, on an 'as-is' basis," and the third

purchased "nails which had been sitting in inventory" as "old stock" for years. *Id.* at 16-17.

Dubai Wire claims that Commerce erred in finding these sales to be commercially

interchangeable with the nails in Dubai Wire's sales to other customers.

Challenging Commerce's finding of targeting by geographic region, Dubai Wire claims that it accidentally failed to recover freight costs for a shipment to a particular inland customer, resulting in a small shortfall not contemplated in its agreement with the customer, who later informed Commerce of its intent to conform the sale with the agreement to cover the shortfall. *Id.* at 19-20. In Dubai Wire's view, Commerce acted unreasonably in basing its finding of targeted dumping by geographic region on this shortfall. *Id.*

Dubai Wire claims that the statute does not permit non-dumped sales to be used to establish a pattern of prices constituting targeted dumping. *Id.* 20-21. Dubai Wire notes that the *SAA* "provides that targeted dumping takes place when 'an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions,'" and argues that this supports a reading of the statute that requires Commerce to find sales to be dumped before they can be analyzed for targeting. *Id.* at 21. Dubai Wire claims that any other construction of the law could "lead to the absurd result of finding that an exporter is guilty of 'targeted dumping' without selling merchandise at dumped prices." *Id.*

Dubai Wire's final challenge to the *Remand Results* claims that Commerce erred when it refused to offset the positive margin from the A-T results with the negative margin from the A-A results. *Id.* at 23-24. Dubai Wire identifies three separate applications of this practice of failing to offset positive margins with negative ones, a practice known as "zeroing": (1) zeroing negative margins in the A-T results from tested sales found not to be targeted; (2) zeroing negative margins in A-A results when combining them with positive margins from A-T results within the same product type (known as a "CONNUM"); and (3) zeroing negative margins in A-A results

when combining them with positive margins from A-T results for other CONNUMs. *Id.* at 23.

Dubai Wire claims there is no rationale for repeating zeroing in steps two and three under

Commerce's own methodology. *Id.* at 23.

### B.      Commerce's Responses to Dubai Wire

Commerce argues that the statute does not require it to first ascertain that sales were

made at less than fair value (i.e. dumped) before considering whether those sales were targeted.

*US Response* at 19-20. In Commerce's view, the statute refers solely to analyzing export or

constructed export prices when determining if there is a pattern of prices that indicates targeting;

it is only after such a pattern is identified that the statute contemplates comparison of normal

value to export price or constructed export price, and the comparison method Commerce should

use. *Id.* Therefore, in Commerce's view, the statute can only be read as calling for a targeting

analysis *prior* to a dumping finding, since the dumping finding can only be reached once a

comparison method is identified and applied. *Id.*

Likewise, the government argues that Commerce is only required by the statute to

identify a pattern of targeted sales and need not consider whether there is a *de minimis* number of

such sales. *See id.* at 20-23. The government contends that the cumulative amount of targeting is

the important consideration under the statute, rather than the targeting along each of the three

axes (customer, location, and time period) in isolation. *Id.* at 21-22. In any case, the government

argues that the cumulative volume of Dubai Wire's sales that were found to be targeted is well

above a level that could be considered *de minimis* even were Commerce to impose a *de minimis*

test here. *Id.* at 22-23.

The government rejects Dubai Wire's contention that its sales to particular customers were discounted due to being of second quality or from old stock because such a conclusion was not clear from the evidence in the administrative record. *Id.* at 23-24. As for Dubai Wire's purported "mistake" regarding the failure to recover freight costs for a particular sale, Commerce contends that no evidence of this mistake, or the customer's intention to correct it, is reflected in the record, upon which Commerce is required to base its decision. *Id.* at 24.

Commerce disputes Dubai Wire's argument that it should have considered the commercial reasons why Dubai Wire's prices varied over the POI (i.e. due to input cost increases that Dubai Wire sought to recover). *Id.* at 26-28. Commerce states that it is not required by statute to consider the reasons behind patterns of low-priced sales by time period, and cites several recent court decisions as supporting the proposition that Commerce need not consider motive when finding targeting. *Id.* at 26-27.

The United States argues that the statute and *Limiting Regulation* do not specify how Commerce must compare the results of the A-A method with the A-T method in applying the *Limiting Regulation*. *Id.* at 30-31. Commerce contends that it reasonably segregated the results of the two methodologies by applying zeroing in the A-A comparison but not in the A-T comparison, and then by calculating margins separately for each comparison methodology without offsetting the results of one method with the results of the other. *Id.* at 31.

## C.      Analysis

The Court finds Commerce's construal of the statute reasonable and entitled to deference with regard to the issues raised by Dubai Wire. The statute does not specify whether Commerce

may consider non-dumped sales when identifying whether there is a pattern of prices constituting

targeting, as Dubai Wire claims. In the absence of a clear command from Congress via the

statute, Commerce has wide latitude under *Chevron* to adopt a reasonable construal. Here,

Commerce has adopted the reasonable interpretation of first identifying whether a pricing pattern

exists, and only then determining whether that pricing pattern involves dumping. Not only is this

a reasonable interpretation of the language of the statute, but it is hard to imagine how the statute

could be administered were Commerce to adopt Dubai Wire's preferred approach. This is

because no determination can be reached as to whether dumping has occurred without comparing

the prices of sales of the subject merchandise in the home market with the prices of sales of the

product in the United States. But Commerce cannot make that determination without choosing to

compared prices using either the A-A, T-T, or A-T method. It would be putting the cart before

the horse to use the outcome of the price comparison methodology to determine which price

comparison methodology could be used. Because Commerce has reasonably construed the

statute in this regard, the Court upholds this aspect of the *Remand Results*.

On the issue of whether Commerce must adopt a *de minimis* number of sales beneath

which those sales will not support a finding of targeting, the Court also rejects Dubai Wire's

argument. This is, again, an issue not specified by the statute and thus reviewable only for

whether Commerce has come to a reasonable interpretation of the statute that it administers.

Commerce's determination that the relevant concern is the total volume of targeted sales across

all three of the targeting axes is a reasonable approach not contradicted by the statute. And

Commerce is correct that, even if Commerce were to adopt a *de minimis* level of targeting

beneath which it would not apply the A-T comparison method, the volume of Dubai Wire's sales found to be targeted would exceed that level based on the record evidence in this case. For these reasons, the Court upholds this aspect of the *Remand Results*.

The Court finds that Commerce's determination of the factual issues raised by Dubai Wire—whether certain sales were of second quality or old stock—was supported by substantial evidence. Dubai Wire's argument rests on a generous interpretation of the information on the record, which Commerce considered but by which it was not persuaded. The Court finds that Commerce's rejection of this argument was proper. Similarly, Commerce is required to make its determinations solely on the basis of evidence in the record. Commerce therefore could not take into account the purported mistake regarding freight costs associated with a shipment of Dubai Wire's nails, about which the record was silent. The Court therefore upholds the *Remand Results* on this issues.

The issue of whether Commerce must consider explanations for *why* there exists a pattern of prices that varies (i.e. targeting) was definitively resolved in *JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015). The Court of Appeals held in that case that 19 U.S.C. § 1677f-1(d)(1)(B) "does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods, nor does it mandate which comparison methods Commerce must use in administrative reviews. As a result, Commerce looks to its practices in antidumping duty investigations for guidance. . . . we agree with the CIT that requiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is

not required or suggested by the statute.'" *JBF RAK LLC*, 790 F.3d at 1368 (quoting *JBF RAK LLC v. United States*, 38 CIT ___, ___, 991 F. Supp. 2d 1343, 1355 (2014)). The Court therefore rejects Dubai Wire's argument on this issue and affirms the *Remand Results* in this regard.

Finally, the statute and regulations are silent as to how Commerce should compare the results of the A-A method with the A-T method in applying the *Limiting Regulation*. The matter is therefore squarely within Commerce's purview and the Court defers to Commerce's reasonable decision to reject an offset of the results of A-T method with the results of the A-A method. Therefore the Court upholds this aspect of the *Remand Results* as well.

CONCLUSION

For the reasons given above, the Court determines that the *Remand Results* complied with the Court's remand order, were not contrary to law, and were supported by substantial evidence. The *Remand Results* are therefore affirmed. Judgment shall enter for Defendant.

/s/Gregory W. Carman
Gregory W. Carman, Senior Judge

Dated:      November 3, 2015
            New York, NY